

# COMMONWEALTH OF MASSACHUSETTS
## Office of Consumer Affairs and Business Regulation
### DIVISION OF INSURANCE
1000 Washington Street, Suite 810 • Boston, MA  02118-6200
(617) 521-7794 • FAX (617) 521-7475
TTY/TDD (617) 521-7490
http://www.mass.gov/doi

**DEVAL L. PATRICK**
GOVERNOR

**GREGORY BIALECKI**
SECRETARY OF HOUSING AND
ECONOMIC DEVELOPMENT

**TIMOTHY P. MURRAY**
LIEUTENANT GOVERNOR

**BARBARA ANTHONY**
UNDERSECRETARY

**JOSEPH G. MURPHY**
COMMISSIONER OF INSURANCE

March 4, 2013

AXIS REINSURANCE COMPANY
c/o Corporation Service Company
84 State Street
Boston, MA 02109


Re: Service of Process


Dear Sir or Madam:

Enclosed you will find legal process which was served upon the Commissioner of Insurance, in his capacity as attorney and registered agent for, Service of Process* for a foreign insurance company, as provided for in Massachusetts General Laws, Chapter 175, §151(3) and §154.

**\* Please note: All future inquiry or correspondence should be directed to the attention of the attorney of record of the enclosed documents.**


Sincerely,

Stacy Siegan
Assistant to the General Counsel
(617) 521-7310


Enclosure(s)

# Commonwealth of Massachusetts

SUFFOLK, ss.



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 2013-0708-BLS

BioChemics, Inc. and John Masiz _____ , Plaintiff(s)

v.

Axis Reinsurance Company, Brown & Brown of
New York, Inc. and John P. Raucci _____ , Defendant(s)

## SUMMONS

AXIS Reinsurance Company
c/o Legal Department
Division of Insurance
1000 Washington Street, Suite 810
Boston, MA 02118

To the above-named Defendant:

You are hereby summoned and required to serve upon _Steven L. Schreckinger,_

_Anderson & Kreiger LLP_

plaintiff's attorney, whose address is _One Canal Park, Suite 200, Cambridge, MA 02141_ , an answer to

the complaint which is herewith served upon you, within 20 days after service of this summons upon you,
exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint. You are also required to file your answer to the complaint in the office
of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable
time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which
you may have against the plaintiff which arises out of the transaction or occurrence that is the subject
matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Barbara J. Rouse, Esquire, at Boston, the ___twenty-eighth___ day of
_February_ , in the year of our Lord two thousand ___and thirteen___ .

*Michael Joseph Donovan*

Clerk/Magistrate

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES.

1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.

2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant,
   each should be addressed to the particular defendant.

3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT — (2) MOTOR VEHICLE TORT — (3) CONTRACT — (4) EQUITABLE RELIEF — (5) OTHER

FORM CIV.P. 1 3rd Rev. 20M-10/11

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on _March 4_, 201_3_, I served a copy of the within summons, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5):

_By First Class mail to AXIS Reinsurance Company c/o Corporation Service Company at 84 State Street, Boston, MA 02109_

Dated: _3/4/13_ ,201____

_Stacy Siegan_

STACY SIEGAN

**N.B.   TO PROCESS SERVER: –**
**PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN**
**THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.**

RECEIVED

MAR – 4 2013

DIVISION OF INSURANCE
LEGAL DIVISION

,201 .

**Commonwealth of Massachusetts**

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION
No. ___2013-0708-BLS___

BioChemics, Inc., et al.

, Plff(s).

v.

AXIS Reinsurance Company, et al.

, Deft(s).

SUMMONS
(Mass. R. Civ. P. 4)

(AFFIX FILING STAMP HERE)

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                            Superior Court
                                                       Civ. A. No. 2013 3  0708 B.LS

| | |
|---|---|
| BIOCHEMICS, INC. and JOHN MASIZ,<br>Plaintiffs,<br><br>v.<br><br>AXIS REINSURANCE COMPANY, BROWN &<br>BROWN OF NEW YORK, INC. and JOHN P.<br>RAUCCI,<br>Defendants. | <br>RECEIVED<br>FEB 27 2013<br>SUPERIOR COURT - CIVIL<br>MICHAEL JOSEPH DONOVAN<br>CLERK / MAGISTRATE |

## COMPLAINT

### Introduction

1.      In this action, plaintiffs seek to recover damages caused by the breach of their

current directors and officers ("D&O") liability insurer, defendant AXIS Reinsurance Company

("AXIS"), of its duty to defend them in underlying proceedings commenced by the SEC.

Plaintiffs also seek to recover damages caused by negligence and other wrongful conduct of the

insurance broker defendants, Brown & Brown of New York, Inc. ("Brown & Brown") and John

P. Raucci, in connection with the placement of D&O coverage for plaintiff BioChemics, Inc. and

handling of the BioChemics' account.  Brown & Brown wrongfully failed to have a licensed

Massachusetts broker involved in the BioChemics' account, as required by Mass. G.L. c. 175, §

162I, and unfairly and deceptively sought to conceal its failure to comply with the licensing

statute by asserting that the "producer," or broker, for the account was a Brown & Brown

employee – Raucci – who holds a Massachusetts producer's license but has played no role in the

account.  Brown & Brown also moved BioChemics' D&O coverage from one insurer (XL

Group) to another (AXIS) without:  (i) discussing with BioChemics whether there were any

circumstances or matters that should be reported to XL before the XL coverage expired, and (ii)

calling to BioChemics' attention the availability of an extending reporting period under the XL

policy.  As a result of Brown & Brown's negligence and other wrongful conduct and Raucci's

dereliction of his responsibilities as the designated "producer" for the account, plaintiffs to date

have been unable to obtain insurance coverage for the SEC proceedings, and they have been

required to incur legal fees and other expenses for both the defense of the SEC proceedings and

the pursuit of insurance coverage for those proceedings.

### The Parties

2.      Plaintiff BioChemics, Inc. ("BioChemics") is a corporation organized under the

laws of Delaware, with a principal place of business in Danvers, Massachusetts.

3.      Plaintiff John Masiz is the President and Chief Executive Officers of BioChemics.

Mr. Masiz resides in Topsfield, Massachusetts.

4.      Defendant AXIS Reinsurance Corporation ("AXIS") is an insurance company

incorporated under the laws of New York with a principal place of business in Alpharetta,

Georgia.  AXIS is and was at all times relevant to this Complaint licensed to write property and

casualty insurance in Massachusetts.

5.      Defendant Brown & Brown of New York, Inc. ("Brown & Brown") is a

corporation organized under the laws of New York with a place of business in Purchase, New

York.  On information and belief, Brown & Brown is a subsidiary of Brown & Brown, Inc.

("B&B Inc.").

6.      Defendant John P. Raucci ("Raucci") is licensed as an insurance producer with

the Massachusetts Division of Insurance and was designated by Brown & Brown as the

"producer" for the BioChemics account.  On information and belief, Mr. Raucci resides in

Stamford, Connecticut.

**Jurisdiction and Venue**

7.    This Court has jurisdiction over this action pursuant to Mass. G.L. c. 212, § 3.

8.    Venue is proper in this Court pursuant to Mass. G.L. c. 223, § 8.

**BioChemics' Relationship with Brown & Brown**

9.    BioChemics is a small specialty pharmaceutical company. BioChemics' focus is on the development of topical and transdermal drug delivery systems that will allow drugs that presently cannot be delivered transdermally to be delivered efficiently through the skin.

10.    At all times relevant to plaintiffs' claims, Brown & Brown has been BioChemics' insurance broker.

11.    The website for B&B, Inc., the parent company of Brown & Brown, describes B&B, Inc. as "one of the largest and most respected independent insurance intermediaries" in the United States. The B&B, Inc. website states:

> Regardless of what some would like you to believe, insurance is not a commodity that should be purchased without the advice of an insurance professional. Whether it's your family's assets, or your business, your insurance needs should be reviewed by an insurance professional who has the knowledge and expertise to design an insurance program that will effectively and economically suit your needs.

12.    The B&B, Inc. website further states:

> The insurance professionals at Brown & Brown can assist you in selecting the best coverage for your particular situation, provided by highly rated, financially secure insurance companies.

> And, the service you receive continues year round. We make sure that your insurance coverage continues to meet your needs as those needs change.

13.    BioChemics, a small company without an in-house risk manager, relied on Brown & Brown to ensure that BioChemics' insurance coverage, including its D&O coverage, was adequate.

14.     Brown & Brown designated Raucci as the "producer" for the BioChemics'
account, but BioChemics never dealt with Raucci.

## The XL Policy

15.     For the period from November 13, 2010 to November 13, 2011, BioChemics had
D&O coverage through a "Private Company Reimbursement Insurance Policy" issued by
Greenwich Insurance Company, a member of the XL Group (hereinafter "XL").

16.     The XL policy's D&O coverage part is written on a claims-made basis. The
D&O coverage part obligates XL to pay "loss" resulting from any "claim" first made against an
"Insured Person" or against BioChemics during the policy period or "extended policy period" for
a "Wrongful Act."

17.     The XL policy defines the term "loss" to include "defense expenses," and the
policy additionally obligates XL to defend any covered "claim."

18.     For purposes of the D&O coverage part, the XL policy defines the term "claim"
to include "a formal civil, criminal, administrative, or regulatory investigation of an 'Insured
Person' which is commenced by the filing or issuance of notice of charges, formal investigative
order or similar document specifically identifying in writing such Insured Person as a person
against whom a [civil action or criminal proceeding] may be commenced."

19.     The XL policy defines the term "Insured Persons" to include BioChemics' past,
present and future directors, officers and employees.

20.     The XL policy defines the term "Wrongful Act" to include "any actual or alleged
act, error, omission, misstatement, misleading statement or breach of duty."

21.     The XL policy uses the term "extended policy period" to describe the insured's
right, upon expiration of the policy, to purchase a one or two-year "extension of the coverage

provided by this Policy." This "extended policy period" applies to "any Claim first made during the one or two-year period of time after the Policy Expiration Date, but only with respect to Wrongful Acts occurring prior to the Policy Expiration Date."

### The Pre-November 2011 SEC Document Subpoenas

22.    In May 2011 and September 2011, the United States Securities & Exchange Commission ("SEC") served document subpoenas on BioChemics.

23.    A true and accurate copy of the document subpoena served on BioChemics by the SEC in May 2011 is attached as Exhibit A.

24.    A true and accurate copy of the document subpoena served on BioChemics by the SEC in September 2011, along with the cover letter served with the subpoena, is attached as Exhibit B.

25.    The May 2011 and September 2011 subpoenas indicated that the SEC had issued an investigative order authorizing the subpoenas, and that they were served "In the Matter of BioChemics, Inc. (B-02641)."

26.    No deposition subpoenas were served on BioChemics or any of its officers, directors or employees in May or September of 2011.

27.    BioChemics, through counsel, responded to the May and September 2011 SEC document subpoenas.

28.    In the fall of 2011, after BioChemics had responded to the May and September 2011 document subpoenas, BioChemics believed that the SEC's investigation was concluded.

### The November 2011 D&O Renewal

29.    The XL Policy came up for renewal in November 2011.

30.    In October 2011, Brown & Brown forwarded to BioChemics a "pre-filled" XL renewal application for continued D&O coverage from XL.

31.    BioChemics completed the XL renewal application and returned it to Brown & Brown.

32.    On information and belief, Brown & Brown did not obtain a renewal quote from XL and was otherwise aware that it would not be placing BioChemics' D&O coverage for the 2011-12 period with XL.

33.    Brown & Brown placed BioChemics' D&O coverage for the 2011-12 period with AXIS.

34.    Before Brown & Brown bound coverage with AXIS, neither Raucci nor anyone else at Brown & Brown discussed with BioChemics the risks of placing the D&O coverage with an insurer other than XL.

35.    Before Brown & Brown bound coverage with AXIS, neither Raucci nor anyone else at Brown & Brown discussed with BioChemics whether, in light of a potential change in carrier, there were any circumstances or matters of which XL should be put on notice before the XL coverage expired.

36.    Neither Raucci nor anyone else at Brown & Brown ever called to BioChemics' attention the availability of an extended reporting period under the XL policy, which BioChemics could purchase if coverage was not renewed with XL.

**The AXIS Policy**

37.    For the period from November 13, 2011 to November 13, 2012, BioChemics had D&O coverage through a "Privatus" insurance package policy issued by AXIS (the "AXIS policy").

38.     A true and accurate copy of the AXIS policy is attached as Exhibit C.

39.     The premium for the AXIS policy was $46,250.

40.     The AXIS policy is written on a claims-made basis. The D&O coverage part of the AXIS policy obligates AXIS to pay "all Loss on behalf of any Insured arising from any D&O Claim for a Wrongful Act . . . first made against such insured . . . during the Policy Period . . ."

41.     The AXIS policy defines the term "Loss" to include reasonable and necessary legal fees and expenses incurred by or on behalf of Insureds in defending, settling, appealing or investigating claims.

42.     The AXIS Policy also obligates AXIS to defend any "D&O Claim" made against an "Insured" alleging a "Wrongful Act."

43.     For purposes of the D&O coverage part, the AXIS policy defines the term "Insured" to include BioChemics and its officers and directors, along with "Employees," other than independent contractors, who are named in any "D&O Claim."

44.     The AXIS policy defines the term "D&O Claim" to include: (i) a written demand against an "Insured" for monetary or non-monetary relief; (ii) an administrative or regulatory proceeding against any "Insured" commenced by the filing of a notice of charge, investigative order or like document or by written notice or subpoena from an authority identifying the "Insured" as an entity or person against whom a formal proceeding may be commenced; or (iii) a civil proceeding against any "Insured" commenced by the service of a complaint or similar pleading.

45.     For purposes of the D&O coverage part, the AXIS policy defined the term "Wrongful Act" to mean any actual or alleged error, misstatement, misleading statement, act,

omission, neglect or breach of duty by BioChemics or its officers and directors in their capacity as such.

### The 2012 SEC Deposition Subpoenas and the Wells Notice

46.     On information and belief, in late 2011, the SEC received information about BioChemics that concerned allegations that were separate and distinct from the allegations that had prompted the SEC to serve the May 2011 and September 2011 document subpoenas on BioChemics.

47.     On information and belief, the additional information that the SEC obtained caused it, in January 2012, to served deposition subpoenas on Mr. Masiz and on: Dr. Stephen Carter, BioChemics' Executive Vice-President for Research & Development and Chief Scientific Officer; Robert Duke Garvin, BioChemics' Senior Vice-President for Business Development; Elizabeth Russo, BioChemics' comptroller; and Kevin Cassidy and Joseph Frattaroli, both BioChemics' board members.

48.     On information and belief, as a matter of convenience, the SEC proceeded under the prior investigative order in serving the deposition subpoenas, rather than issuing a new investigative order. The deposition subpoenas therefore stated that they were served "In the Matter of BioChemics, Inc. (B-02461)."

49.     A true and accurate copy of a January 5, 2012 cover letter and the enclosed deposition subpoenas for Mr. Cassidy, Mr. Frattaroli and Dr. Carter is attached as Exhibit D.

50.     A true and accurate copy of a January 12, 2012 cover letter and the enclosed deposition subpoenas for Ms. Russo, Mr. Garvin and Mr. Masiz is attached as Exhibit E.

51.     BioChemics paid for counsel to represent the persons subpoenaed at their depositions.

52.     In March 2012, the SEC served an additional document subpoena on Biochemics and a document subpoena on Mr. Masiz.

53.     A true and accurate copy of the document subpoena served on BioChemics by the SEC in March 2012, along with the accompanying cover letter, is attached as Exhibit F.

54.     A true and accurate copy of the document subpoena served on Mr. Masiz by the SEC in March 2012, along with the accompanying cover letter, is attached as Exhibit G.

55.     In June 2012, the SEC issued a "Wells notice." The Wells notice advised BioChemics and Mr. Masiz that the SEC's Boston office was considering recommending that the SEC institute a civil injunctive proceeding against them alleging violations of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. The Wells notice also advised that the Boston office was considering recommending that the SEC institute a public administrative proceeding against Mr. Masiz.

56.     The theory of liability set forth in the Wells notice was that BioChemics and Mr. Masiz had made allegedly fraudulent statements (and other omissions that allegedly rendered other statements misleading) to prospective investors concerning:

      a.     the clinical trial status of BioChemics' transdermal drug delivery system;

      b.     the nature and status of the facts contained in certain third-party valuations of BioChemics; and

      c.     the nature and size of the personal investments made in BioChemics by Mr. Masiz and his parents.

**The SEC Civil Action**

57.     In November 2012, BioChemics renewed its D&O coverage with AXIS.

58.     In December 2012, the SEC filed a civil action against BioChemics, Mr. Masiz and two other individuals, Gregory Kroning and Craig Medoff, who allegedly "promoted" BioChemics to potential investors.

59.     The SEC complaint alleges that from 2009 to mid-2012, the defendants engaged in a fraudulent scheme to sell BioChemics securities to investors.

60.     The SEC complaint alleges that the defendants made false and misleading statements concerning, among other things, the status of research and development collaboration agreements with other companies; the progress of drugs under development, and valuations of BioChemics prepared by third parties.

61.     The SEC complaint alleges that the defendants violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

### AXIS's Denials of Coverage

62.     In April 2012, BioChemics put AXIS on notice of the various subpoenas served by the SEC, including the deposition subpoena served upon Mr. Masiz.

63.     In a May 18, 2012 letter from its attorneys to BioChemics' outside counsel, AXIS denied coverage for all of the subpoenas.

64.     A true and accurate copy of the May 18, 2012 letter denying coverage is attached as Exhibit H.

65.     The ground for AXIS's denial of coverage was that all of the SEC subpoenas were part of a single claim that was first made in May 2011, several months before the AXIS policy took effect, when the SEC issued a document subpoena to BioChemics. Therefore, AXIS contended, none of the subpoenas constituted a claim "first made" during the AXIS policy period, as required for coverage to apply.

66.     BioChemics thereafter provided AXIS with additional information and documents concerning the SEC proceedings.

67.    In a December 11, 2012 letter from its attorneys to BioChemics' outside counsel, AXIS reiterated its denial of coverage for all of the subpoenas.

68.    A true and accurate copy of the December 11, 2012 letter reiterating AXIS's denial of coverage is attached as Exhibit I.

69.    AXIS has verbally advised outside counsel for BioChemics that it anticipates denying coverage for the SEC civil action.

### Brown & Brown's Concealment of Its Failure to Comply With Massachusetts Licensing Requirements

70.    By letter dated January 7, 2013, BioChemics made a demand for relief on Brown & Brown pursuant to Mass. G.L. c. 93A.

71.    The January 7, 2013 letter alleged, in part, that Brown & Brown had violated c. 93A by placing insurance for risks located in Massachusetts without a Massachusetts producer's license, as required by G.L. c. 175, § 162I.

72.    The January 7, 2013 letter alleged, in part, that Brown & Brown failed to advise BioChemics or Mr. Masiz that it was not licensed as a producer in Massachusetts.

73.    Brown & Brown responded to the January 7, 2013 letter by letter dated January 24, 2013 from Mark E. King, Chief Litigation Counsel for B&B, Inc.

74.    The letter stated that Raucci is the "producer" on the BioChemics' account and holds a Massachusetts producer's license.

75.    On information and belief, Raucci has had no substantive involvement in the handling of the BioChemics' account.

76.    The Brown & Brown employees who have handled the BioChemics' account are not licensed with the Massachusetts Division of Insurance ("DOI") as insurance producers, as required by Mass. G.L. c. 175, § 162I.

77.     In its January 24, 2013 letter, Brown & Brown unfairly and deceptively sought to pass off the license held by Raucci as applying to the BioChemics' account when Raucci has had no substantive involvement in the account.

78.     The January 24, 2013 letter further stated that the "Brown & Brown agency" holds a Massachusetts producer's license.

79.     The "Brown & Brown agency" to which the January 24, 2013 letter refers is an entity named "Brown & Brown Insurance Agency," which is located in Rochester, New York.

80.     Since it retained Brown & Brown as its insurance broker, BioChemics has dealt exclusively with a Brown & Brown office located in Purchase, New York.

81.     The Brown & Brown website states that B&B, Inc. has a "decentralized structure" in which each of the 170 local offices in the United States (referred to within B&B, Inc. as "entrepreneurial entities" or "profit centers") handles its own customer service and claims activities.

82.     In its January 24, 2013 letter, Brown & Brown unfairly and deceptively sought to pass off the license held by the "Brown & Brown Insurance Agency" as applying to the BioChemics' account when BioChemics has had no dealings with the Brown & Brown Insurance Agency or with any B&B, Inc. or Brown & Brown entity located in Rochester, New York.

## COUNT I – BREACH OF CONTRACT V. AXIS

83.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 82.

84.     The AXIS policy obligates AXIS to provide a defense against the various SEC proceedings, including the subpoenas, the Wells notice and the recently-filed civil action.

85.     AXIS has been put on notice of the SEC proceedings.

86.    AXIS has failed to provide a defense against the SEC proceedings.

87.    AXIS's failure to provide a defense against the SEC proceedings is a breach of the AXIS policy.

88.    Plaintiffs have been damaged as a result of AXIS's breach of its obligations under the policy it issued to BioChemics.

### COUNT II – NEGLIGENCE V. BROWN & BROWN

89.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 88.

90.    Brown & Brown, as BioChemics' insurance broker, owed a duty of care to BioChemics and its officers, directors and employees.

91.    Brown & Brown held itself out as having the knowledge and expertise required to design an insurance program that would effectively and economically suit the needs of BioChemics and its officers, directors and employees.

92.    Brown & Brown held itself out as having the knowledge and expertise required to ensure that BioChemics' insurance coverage met the needs of the company and its officers, directors and employees as those needs changed.

93.    Brown & Brown breached its duty of care to BioChemics and its officers, directors and employees by failing, among other things:  (i) to discuss with BioChemics the risks of placing the D&O coverage with an insurer other than XL; (ii) to discuss with BioChemics whether, in light of a potential change in D&O carrier, there were any circumstances or matters of which XL should be put on notice before the XL coverage expired; and (iii) to call to BioChemics' attention the availability of the extended reporting period under the XL policy, which BioChemics could purchase if coverage was not renewed with XL.

94.     Plaintiffs have been harmed as a result of Brown & Brown's breaches of the duty of care.

## COUNT III – NEGLIGENCE V. RAUCCI

95.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 94.

96.     Raucci, by virtue of his designation as the "producer" for the BioChemics' account, owed a duty of care to BioChemics and its officers, directors and employees.

97.     Raucci breached his duty of care to BioChemics and its officers, directors and employees by abdicating his responsibilities as the "producer" for the BioChemics' account. Raucci failed, among other things:  (i) to discuss with BioChemics the risks of placing the D&O coverage with an insurer other than XL; (ii) to discuss with BioChemics whether, in light of a potential change in D&O carrier, there were any circumstances or matters of which XL should be put on notice before the XL coverage expired; and (iii) to call to BioChemics' attention the availability of the extended reporting period under the XL policy, which BioChemics could purchase if coverage was not renewed with XL.

98.     Plaintiffs have been harmed as a result of Raucci's breaches of the duty of care.

## COUNT IV – BREACH OF FIDUCIARY DUTY V. BROWN & BROWN

99.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 98.

100.    Brown & Brown held itself out to BioChemics and its officers, directors and employees as an insurance specialist, consultant and counselor, and as having specialized expertise.

101.    BioChemics, a small company without an in-house risk manager, reposed trust and confidence in Brown & Brown and relied on Brown & Brown's assurances that it would

"make sure" that BioChemics' insurance coverage, including BioChemics' D&O coverage, met the needs of BioChemics and its officers, directors and employees.

102.    Brown & Brown breached its fiduciary obligations to BioChemics and its officers, directors and employees. Brown & Brown's breaches of its fiduciary obligations include its failures: (i) to discuss with BioChemics the risks of placing the D&O coverage with an insurer other than XL; (ii) to discuss with BioChemics whether, in light of a potential change in D&O carrier, there were any circumstances or matters of which XL should be put on notice before the XL coverage expired; and (iii) to call to BioChemics' attention the availability of the extended reporting period under the XL policy, which BioChemics could purchase if coverage was not renewed with XL.

103.    Plaintiffs have been harmed as a result of Brown & Brown's breaches of its fiduciary duties.

### COUNT V – BREACH OF FIDUCIARY DUTY V. RAUCCI

104.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 103.

105.    Raucci, by virtue of permitting himself to be designated as the "producer" for the BioChemics' account, owed a fiduciary duty to BioChemics and its officers, directors and employees.

106.    Raucci breached his fiduciary obligations to BioChemics and its officers, directors and employees by abdicating his responsibilities as "producer" for the BioChemics' account. Raucci failed, among other things: (i) to discuss with BioChemics the risks of placing the D&O coverage with an insurer other than XL; (ii) to discuss with BioChemics whether, in light of a potential change in D&O carrier, there were any circumstances or matters of which XL should be put on notice before the XL coverage expired; and (iii) to call to BioChemics'

attention the availability of the extended reporting period under the XL policy, which

BioChemics could purchase if coverage was not renewed with XL.

107.   Plaintiffs have been harmed as a result of Raucci's breaches of his fiduciary

duties.

## COUNT VI – MASS. G.L. c. 93A V. BROWN & BROWN

108.   Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1

through 107.

109.   At all relevant times, BioChemics and Brown & Brown each were engaged in

trade or commerce.

110.   Brown & Brown violated G.L. c. 175, § 162I and G.L. c. 93A, § 2 by placing

insurance for BioChemics, a Massachusetts-based company with risks located in Massachusetts,

when the Brown & Brown employees who handled the BioChemics' account were not licensed

as insurance producers by the Massachusetts Division of Insurance.

111.   Brown & Brown additionally violated G.L. c. 93A, § 2 by, among other things:

(i)   attempting to pass off licenses held by Raucci and the Brown & Brown
Insurance Agency as applying to the BioChemics' account when neither
Raucci nor the Brown & Brown Insurance Agency had any involvement
with the BioChemics' account;

(ii)   otherwise unfairly and deceptively concealing Brown & Brown's failure
to comply with G.L. c. 175, § 162I; and

(iii)   withholding information from BioChemics regarding the November 2011
renewal.

112.   Brown & Brown's violations of G.L. c. 93A, § 2 and unfair and deceptive acts

and practices occurred primarily and substantially in Massachusetts.

113.    On information and belief, Brown & Brown's violations of G.L. c. 93A, § 2 and unfair and deceptive acts and practices were done willfully and knowingly.

114.    Plaintiffs have suffered a loss of money or property as a result of Brown & Brown's violations of G.L. c. 93A, § 2 and unfair and deceptive acts and practices.

### COUNT VII – MASS. G.L. C. 93A V. RAUCCI

115.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 114.

116.    At all relevant times, BioChemics and Raucci each were engaged in trade or commerce.

117.    Raucci violated G.L. c. 175, § 162I and G.L. c. 93A, § 2 by allowing himself to be designated as the "producer" for the BioChemics' account when he had no involvement with the account.

118.    Raucci additionally violated G.L. c. 93A, § 2 by, among other things:

    (i)     aiding and abetting Brown & Brown in its attempt to pass off his Massachusetts producer's license as applying to an account in which he had no involvement;

    (ii)    otherwise unfairly and deceptively concealing his and Brown & Brown's failure to comply with G.L. c. 175, § 162I; and

    (iii)   withholding information from BioChemics regarding the November 2011 renewal of BioChemics' D&O coverage.

119.    Raucci's violations of G.L. c. 93A, § 2 and unfair and deceptive acts and practices occurred primarily and substantially in Massachusetts.

120.    On information and belief, Raucci's violations of G.L. c. 93A, § 2 and unfair and deceptive acts and practices were done willfully and knowingly.

121.  · Plaintiffs have suffered a loss of money or property as·a result of Raucci's violations of G.L. c. 93A, § 2 and unfair and deceptive acts and practices.

WHEREFORE, plaintiffs respectfully request that the Court:

1.  On Count I, enter judgment for plaintiffs and award them their damages suffered as a result of AXIS's breach of contract;

2.  On Count I, additionally award plaintiffs their attorney's fees and costs incurred in establishing AXIS's duty to defend, pursuant to *Preferred Mutual Insurance Co. v. Gamache*, 426 Mass. 93 (1997) and *Rubenstein v. Royal Insurance Co. of America*, 44 Mass. App. Ct. 842 (1998);

3.  On Counts II through VII, enter judgment for plaintiffs and award them their damages suffered as a result of Brown and Brown's and Raucci's negligence, breaches of fiduciary duty and violations of c. 93A;

4.  · On Counts VI and VII, additionally award plaintiffs treble damages, attorney's fees and costs, pursuant to Mass. G.L. c. 93A;

5.  Award plaintiffs all such other relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a jury on all claims so triable.

BIOCHEMICS, INC.
JOHN MASIZ

By their attorneys,

Steven L. Schreckinger (BBO #447100)
sschreckinger@andersonkreiger.com
Anne Robbins (BBO #561968)
arobbins@andersonkreiger.com
ANDERSON & KREIGER LLP
One Canal Park, Suite 200
Cambridge, MA 02141
(617) 621-6500

Dated:  February 27, 2013

{A0173431.6 }                    19

A



# SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

**In the Matter of BioChemics, Inc. (B-02641)**

To:    BioChemics, Inc.
       Attention:  John J. Masiz, President
       99 Rosewood Drive, Suite 260
       Danvers, MA  01923

☒    **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below:

Securities and Exchange Commission, Boston Regional Office, 33 Arch Street, 23rd floor, Boston, Massachusetts  02110, no later than May 24, 2011 at 9:30 a.m.

☐    **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.**
Failure to comply may subject you to a fine and/or imprisonment.

By: _____      Date: _5/9/11_____
    Joshua S. Grinspoon, Attorney
    U.S. Securities and Exchange Commission
    33 Arch Street, 23rd Floor
    Boston, Massachusetts 02110

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this matter.  The Securities and Exchange Commission has issued a formal order authorizing this investigation under:  Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS:     If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

**SUBPOENA ATTACHMENT FOR BIOCHEMICS, INC.**
**May 9, 2011**
In the Matter of BioChemics, Inc. (B-02641)

## A.   **Definitions**

As used in this subpoena, the words and phrases listed below shall have the following meanings:

1.   "BioChemics" means the entity doing business under the name "BioChemics, Inc.", including any parents, subsidiaries, affiliates, predecessors, successors, officers (including without limitation John J. Masiz), directors, employees, agents, or partners of such entity, as well as any aliases, code names, or trade or business names used by any of the foregoing.

2.   "Mercury" means the entity doing business under the name "Mercury Capital Group LLC," including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents or partners of such entity, as well as any aliases, code names, or trade or business names used by any of the foregoing.

3.   "VASO" means the entity doing business under the name "VASO Active Pharmaceuticals, Inc." or "Vaso Active Pharmaceuticals, Inc.", including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents or partners of such entity, as well as any aliases, code names, or trade or business names used by any of the foregoing.

4.   "BC Warrant Holdings" means the entity doing business under the name "BC Warrant Holdings LLC" including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents or partners of such entity, as well as any aliases, code names, or trade or business names used by any of the foregoing.

5.   "Triumvirate Capital Group LP" ("Triumvirate") means the entity doing business under the name "Triumvirate Capital Group LP" including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents or partners of such entity, as well as any aliases, code names, or trade or business names used by any of the foregoing.

6.   "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

7.   A "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants, attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

8.   "Document" shall include, but is not limited to, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice

1

communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, telegrams, facsimiles, messages of any type, telephone messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

9.   "Communication" means any correspondence, contact, discussion, e-mail, instant message, voicemail, or any other kind of oral or written transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

10.   "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in connection with, commenting on, relating to, pertaining to, regarding, discussing, showing, describing, analyzing or reflecting.

11.   An "Agreement" means any actual or contemplated (i) written or oral Agreement; (ii) term or provision of such Agreement; or (iii) amendment of any nature or termination of such Agreement.  A request for any Agreement among or between specified parties includes a request for all Documents Concerning (i) any actual or contemplated Agreement among or between such parties, whether or not such Agreement included any other Person; (ii) the drafting or negotiation of any such Agreement; (iii) any actual or contemplated demand, request or application for any such Agreement, and any response thereto; and (iv) any actual or contemplated objection or refusal to enter into any such Agreement, and any response thereto.

12.   The term "you" and "your" means the Person or entity to whom this subpoena was issued.

13.   To the extent necessary to bring within the scope of this subpoena any information or Documents that might otherwise be construed to be outside its scope:

   a.   the word "or" means "and/or";
   b.   the word "and" means "and/or";
   c.   the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;
   d.   the masculine gender includes the female gender and the female gender includes the masculine gender; and

e.     the singular includes the plural and the plural includes the singular.

**B.     Instructions**

1.     Unless otherwise specified, the subpoena calls for production of the original Documents and all copies and drafts of same. Documents responsive to this subpoena may be in electronic or paper form. Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All electronic Documents responsive to the Document subpoena, including all metadata, should also be produced in their native software format.

2.     For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us photocopies of the Documents in paper format. If you choose to send copies, you must secure and retain the originals and store them in a safe place. The staff may later request or require that you produce the originals.

3.     Whether you scan or photocopy Documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a Document differ in any way, they are considered separate Documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

4.     In producing a photocopy of an original Document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original Document, photocopies of the original Document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

5.     Documents should be produced as they are kept in the ordinary course of business or be organized and labeled to correspond with the categories in this request. In that regard, Documents should be produced in a unitized manner, i.e.., delineated with staples or paper clips to identify the Document boundaries.

6.     Documents should be labeled with sequential numbering (bates-stamped).

**7.     You must produce all Documents created during, or Concerning, the period January 1, 2007 to the present, unless otherwise specified.**

8.     The scope of any given request should not be limited or narrowed based on the fact that it calls for Documents that are responsive to another request.

9.     For any Documents that qualify as records of regularly conducted activities under

3

Federal Rule of Evidence 902(11), please have the appropriate representative of your firm complete a business records certification (a sample of which is enclosed) and return it with the Document production.

10.  This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below.  If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the request, you should submit a list of what you are not producing.  The list should describe each item separately, noting:

   a.  its author(s);
   b.  its date;
   c.  its subject matter;
   d.  the name of the Person who has the item now, or the last Person known to have it;
   e.  the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
   f.  the basis upon which you are not producing the responsive Document;
   g.  the specific request in the subpoena to which the Document relates;
   h.  the attorney(s) and the client(s) involved; and
   i.  in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

11.  If Documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

## C.   Documents to be Produced

1.  All Documents sufficient to identify BioChemics' personnel, including, but not limited to, all Documents (including without limitation all organizational charts) Concerning the role(s), title(s), and responsibility(ies) of each Person who served or serves as an officer, director, principal, employee, member of an advisory board, agent, independent contractor, consultant or representative of BioChemics.

2.  All Documents Concerning any money raised from any Person (including without limitation any investor or lender) by BioChemics, directly or indirectly, including without limitation all Documents evidencing the name and contact information of each such investor or lender, the amount of money raised from each investor or lender, the date the money was raised, the use to which those proceeds were put, and all Documents Concerning such investments or loans, including without limitation all Documents Concerning Communications with such investors or lenders.

3.  All Documents Concerning any stock, bonds, debt, warrants or other securities offered, issued or anticipated to be issued by BioChemics, including without limitation all Documents Concerning Communications between BioChemics (or

any Person on behalf of BioChemics, including without limitation independent contractors, consultants, agents or representatives of BioChemics) and offerees or purchasers of such securities and all Communications between BioChemics and anyone else regarding such securities.

4. Documents sufficient to identify each Person who holds any stock, bonds, debt, warrants or other securities issued by BioChemics, or any right to purchase or obtain any such securities.

5. All solicitation or promotional Documents, offering documents or private placement memoranda, or any other Documents or information Concerning BioChemics, provided or shown by BioChemics or any Person on behalf of BioChemics (including without limitation independent contractors, consultants, agents or representatives of BioChemics) to any investor or lender or prospective investor or lender or to any other Person.

6. All Documents Concerning Communications, either direct or through an intermediary, between BioChemics (or any person on behalf of BioChemics, including without limitation independent contractors, consultants, agents or representatives of BioChemics) and any investor or lender or prospective investor or lender or other Person who holds or has been offered or sold (either by BioChemics or by another Person) any stock, bonds, debt, warrants or other securities issued by BioChemics, or any right to purchase or obtain any such securities.

7. Documents sufficient to describe all products developed, under clinical development, marketed or sold by BioChemics. For those products developed or under clinical development, provide Documents sufficient to indicate the current stage of development.

8. Documents sufficient to describe all patents or other intellectual property owned by BioChemics.

9. All press releases issued by BioChemics.

10. Documents sufficient to describe the existence and status of all requests for approval by the United States Food and Drug Administration ("FDA") of any products in development or being marketed or sold by BioChemics, including without limitation all Correspondence between BioChemics and the FDA.

11. All Documents Concerning any determination by BioChemics that a product it is developing does not need to be submitted for FDA approval.

12. All Documents Concerning Gregory D. Freeman, including without limitation all Documents Concerning Communications between BioChemics and Gregory D. Freeman and all Agreements by, between, or involving both BioChemics and Gregory D. Freeman and all Documents evidencing payments between BioChemics and Gregory D. Freeman.

13. All Documents Concerning Michel Clerin, including without limitation all Documents Concerning Communications between BioChemics and Michel Clerin and all Agreements by, between, or involving both BioChemics and Michel Clerin and all Documents evidencing payments between BioChemics and Michel Clerin;

14. All Documents Concerning Mercury, including without limitation all Documents Concerning Communications between BioChemics and Mercury, all Agreements by, between, or involving both BioChemics and Mercury and all Documents evidencing payments between BioChemics and Mercury;

15. Documents sufficient to demonstrate the current location and contact information of all offices of Mercury Capital Group and Documents sufficient to identify (and indicate contact information for) all owners, managers, principals and employees of Mercury.

16. Documents sufficient to demonstrate the current location and contact information of Michel Clerin.

17. All Agreements by, between, or involving BioChemics and VASO and all Documents evidencing transactions of transfers of funds between BioChemics and VASO.

18. All Documents Concerning Stephen G. Carter, including without limitation all Documents Concerning Communications between BioChemics and Stephen G. Carter and all Agreements by, between, or involving both BioChemics and Stephen G. Carter and all Documents evidencing payments between BioChemics and Steven G. Carter.

19. All Documents Concerning BC Warrant Holdings, including without limitation all Documents Concerning Communications between BioChemics and BC Warrant Holdings and all Agreements by, between, or involving both BioChemics and BC Warrant Holdings.

20. All Documents Concerning Triumvirate, including without limitation all Documents Concerning Communications between BioChemics and Triumvirate and all Agreements by, between, or involving both BioChemics and Triumvirate and all Documents evidencing payments between BioChemics and Triumvirate.

21. All Agreements between BioChemics and any other Person.

22. Documents sufficient to evidence all Agreements or collaborations BioChemics has with other organizations, including without limitation Cynosure, Inc., Pacific Pharmaceuticals, Unilever, Inc., Beth Israel Deaconness Medical Center, Nanobac Pharmaceuticals, Inc. and Harvard University, or any related or affiliated entities of these entities.

23. All Documents Concerning negotiations of a potential business relationship between BioChemics and any other entity, including without limitation GlaxoSmithKline PLC, Sirtris Pharmaceuticals, Inc., Unilever PLC, Unilever NV, Novartis, Inc., Pfizer, Inc., and Astra Aenica, Inc, or any related or affiliated entities of these entities.

24. Documents sufficient to identify all Persons who are sitting or who have sat on BioChemics' Scientific Advisory Board or any other board formed by or for the benefit of BioChemics, and all Documents Concerning Communications with any such Person and all Agreements with any such Person.

25. All Documents Concerning Gregory Kroning ("Kroning"), including without limitation all Documents Concerning Communications between BioChemics and

Kroning, all Agreements by, between, or involving both BioChemics and Kroning and all Documents evidencing payments between BioChemics and Kroning.

26. Documents sufficient to demonstrate the current location and contact information of Gregory Kroning.

27. All Documents Concerning Robert Duke ("Duke"), including without limitation all Documents Concerning Communications between BioChemics and Duke, all Agreements by, between, or involving both BioChemics and Duke and all Documents evidencing payments between BioChemics and Duke.

28. All financial statements or other Documents purporting to summarize the assets, liabilities, revenues or expenses of BioChemics, including without limitation all reports of auditors regarding such financial statements or other Documents, and all Documents which may reflect the financial condition of solvency of BioChemics.

29. Documents sufficient to identify any auditors that BioChemics has employed during the relevant time period.

30. All Documents Concerning all Agreements by, between, or involving both BioChemics and John Masiz and all Documents evidencing payments between BioChemics and John Masiz.

31. All corporate or organizational documents of BioChemics, including without limitation all articles of incorporation, by-laws, stock ledgers, and other Documents evidencing ownership or control of BioChemics (including without limitation Documents sufficient to evidence ownership of all any stock, bonds, debt, warrants or other securities issued by BioChemics).

32. Documents sufficient to evidence all websites, telephone numbers, FAX numbers and business locations of BioChemics.

33. All tax returns, state and federal filed by BioChemics.

34. Documents sufficient to identify any Person who solicited, offered or sold any stock, bond, debt, warrants or other securities offered, issued or anticipated to be issued by BioChemics and Documents sufficient to show the compensation received by any such person.

35. Documents sufficient to identify all banks and other financial institutions at or with which BioChemics has or had accounts or has engaged in transactions.

36. All date books, calendars, telephone logs, telephone messages or other Documents reflecting Communications that John Masiz has had with Gregory D. Freeman, Gregory Kroning, or Robert Duke.

37. All Documents Concerning Trident Growth Fund, L.P. ("Trident"), including without limitation all Documents Concerning Communications between BioChemics and Trident and all Agreements by, between, or involving both BioChemics and Trident and all Documents evidencing payments between BioChemics and Trident.

38. All Documents Concerning any civil action or any other proceeding filed by or against BioChemics.

39.     All payroll records, general ledgers, paystubs, receipts and cancelled checks
        reflecting payments to employees, independent contractors, consultants, agents or
        representatives of BioChemics.



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch St., 23rd Floor
Boston, MA 02110-1424
Telecopier: (617) 573-4590

DIVISION OF ENFORCEMENT

Joshua S. Grinspoon
Attorney
(617) 573-4502

September 12, 2011

**Via UPS**

BioChemics, Inc.
c/o Jason C. Moreau, Esq.
Greenberg Traurig
One International Place
Boston, MA  02110

*SEP 1 3 2011*

Re:   In the Matter of BioChemics, Inc. (B-02641)

Dear Mr. Moreau:

Thank you for agreeing to accept service of this subpoena on behalf of your client, BioChemics, Inc. ("BioChemics").  I have enclosed a subpoena calling for the production of documents, data and information by BioChemics in connection with the above-referenced investigation.  The subpoena requires BioChemics to produce materials by 9:30 a.m. on September 27, 2011 to the SEC's Boston Regional Office.

Please send the materials to:

Joshua S. Grinspoon, Attn: Timothy B. Bagley
U.S. Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 23rd Floor
Boston, MA 02110-1424

Please read carefully the subpoena and attachment and this letter.  Your client must comply with the subpoena and may be subject to a fine and/or imprisonment if it does not.

For any materials that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please have the appropriate representative(s) of BioChemics complete a business records certification (a sample of which is enclosed) and return it with the document production.

BioChemics, Inc.
September 12, 2011
Page 2

If you withhold anything on the basis of a claim of attorney-client privilege or attorney work product protection, you should identify the attorney and client involved. If you withhold anything on the basis of the work product doctrine, you should also identify the litigation in anticipation of which the document was prepared.

If documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such documents and give the date on which they were lost, discarded or destroyed.

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

The information your client provides is subject to the Commission's routine uses. A list of those uses is contained in the enclosed copies of SEC Form 1662, which also contain other important information. Please provide a copy of this form to your client. This investigation is confidential and nonpublic and should not be construed as an indication by the Commission or its staff that any violation of law has occurred, nor as a reflection upon any person, entity, or security.

If you have any questions or would like to discuss this matter, you may call me at (617) 573-4502.

Sincerely,

Joshua S. Grinspoon
Attorney

Enclosures:     Subpoena and Attachment
                SEC Data Delivery Standards
                SEC Form 1662
                Business Records Certification



# SUBPOENA

# UNITED STATES OF AMERICA
# SECURITIES AND EXCHANGE COMMISSION

**In the Matter of BioChemics, Inc. (B-02641)**

To:    BioChemics, Inc.
      c/o Jason C. Moreau, Esq.
      Greenberg Traurig
      One International Place
      Boston, MA  02110

☒    **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below:

    Securities and Exchange Commission, Boston Regional Office, 33 Arch Street, 23rd floor, Boston, Massachusetts  02110, no later than September 27, 2011 at 9:30 a.m.

☐    **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

---

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.**
Failure to comply may subject you to a fine and/or imprisonment.

By: _____      Date: ___9/12/11___
    Joshua S. Grinspoon, Attorney
    U.S. Securities and Exchange Commission
    33 Arch Street, 23rd Floor
    Boston, Massachusetts 02110

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this matter.  The Securities and Exchange Commission has issued a formal order authorizing this investigation under:  Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

---

NOTICE TO WITNESS:     If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

**SUBPOENA ATTACHMENT FOR BIOCHEMICS, INC.**
**September 12, 2011**
In the Matter of BioChemics, Inc. (B-02641)

**A.**   **Definitions**

As used in this subpoena, the words and phrases listed below shall have the following meanings:

1. "BioChemics" means the entity doing business under the name "BioChemics, Inc.", including any parents, subsidiaries, affiliates, predecessors, successors, officers (including without limitation John J. Masiz), directors, employees, agents, or partners of such entity, as well as any aliases, code names, or trade or business names used by any of the foregoing.

2. "VASO" means the entity doing business under the name "VASO Active Pharmaceuticals, Inc." or "Vaso Active Pharmaceuticals, Inc.", including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents or partners of such entity, as well as any aliases, code names, or trade or business names used by any of the foregoing.

3. "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

4. A "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants, attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

5. "Document" shall include, but is not limited to, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, telegrams, facsimiles, messages of any type, telephone messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

6. "Communication" means any correspondence, contact, discussion, e-mail, instant message, voicemail, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations,

1

internal or external discussions, or exchanges of a Document or Documents.

7.     "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in connection with, commenting on, relating to, pertaining to, regarding, discussing, showing, describing, analyzing or reflecting.

8.     An "Agreement" means any actual or contemplated (i) written or oral Agreement; (ii) term or provision of such Agreement; or (iii) amendment of any nature or termination of such Agreement. A request for any Agreement among or between specified parties includes a request for all Documents Concerning (i) any actual or contemplated Agreement among or between such parties, whether or not such Agreement included any other Person; (ii) the drafting or negotiation of any such Agreement; (iii) any actual or contemplated demand, request or application for any such Agreement, and any response thereto; and (iv) any actual or contemplated objection or refusal to enter into any such Agreement, and any response thereto.

9.     The term "you" and "your" means the Person or entity to whom this subpoena was issued.

10.    To the extent necessary to bring within the scope of this subpoena any information or Documents that might otherwise be construed to be outside its scope:

    a.     the word "or" means "and/or";
    b.     the word "and" means "and/or";
    c.     the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;
    d.     the masculine gender includes the female gender and the female gender includes the masculine gender; and
    e.     the singular includes the plural and the plural includes the singular.

**B.     Instructions**

1,     Unless otherwise specified, the subpoena calls for production of the original Documents and all copies and drafts of same. Documents responsive to this subpoena may be in electronic or paper form, except as specified herein. Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All electronic Documents responsive to the Document subpoena, including all metadata, should also be produced in their native software format.

2.     For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us

photocopies of the Documents in paper format. If you choose to send copies, you
must secure and retain the originals and store them in a safe place. The staff may
later request or require that you produce the originals.

3.   Whether you scan or photocopy Documents, the copies must be identical to the
originals, including even faint marks or print. Also, please note that if copies of a
Document differ in any way, they are considered separate Documents and you
must send each one. For example, if you have two copies of the same letter, but
only one of them has handwritten notes on it, you must send both the clean copy
and the one with notes.

4.   In producing a photocopy of an original Document that contains post-it(s),
notation flag(s), or other removable markings or attachments which may conceal
all or a portion of the markings contained in the original Document, photocopies
of the original Document both with and without the relevant post-it(s), notation
flag(s), or removable markings or attachments should be produced.

5.   Documents should be produced as they are kept in the ordinary course of business
or be organized and labeled to correspond with the categories in this request. In
that regard, Documents should be produced in a unitized manner, i.e., delineated
with staples or paper clips to identify the Document boundaries.

6.   Documents should be labeled with sequential numbering (bates-stamped).

7.   **You must produce all Documents created during, or Concerning, the period
January 1, 2007 to the present, unless otherwise specified.**

8.   The scope of any given request should not be limited or narrowed based on the
fact that it calls for data or other information that is responsive to another request,
including any in previously issued subpoenas.

9.   For any Documents that qualify as records of regularly conducted activities under
Federal Rule of Evidence 902(11), please have the appropriate representative of
your firm complete a business records certification (a sample of which is
enclosed) and return it with the Document production.

10.  This subpoena covers all Documents in or subject to your possession, custody or
control, including all Documents that are not in your immediate possession but
that you have the ability to obtain, that are responsive, in whole or in part, to any
of the individual requests set forth below. If, for any reason – including a claim
of attorney-client privilege – you do not produce something called for by the
request, you should submit a list of what you are not producing. The list should
describe each item separately, noting:

a.   its author(s);
b.   its date;
c.   its subject matter;

d.     the name of the Person who has the item now, or the last Person known to have it;

e.     the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;

f.     the basis upon which you are not producing the responsive Document;

g.     the specific request in the subpoena to which the Document relates;

h.     the attorney(s) and the client(s) involved; and

i.     in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

11.    If Documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

## C.     <u>Documents to be Produced</u>

1.     All Documents Concerning any meetings or actions of BioChemics' Board of Directors.

2.     All Documents Concerning any meetings or actions of BioChemics' shareholders or owners of any other ownership interest in BioChemics.

3.     All Documents Concerning Communications between John Masiz and BioChemics' Board of Directors.

4.     All Documents Concerning Communications with Michael Magliochetti.

5.     All Documents Concerning Communications with Steven C. Rockefeller, Jr. or any other member of the Rockefeller family.

6.     All Documents Concerning Communications with Robert E. Anderson.

7.     Documents (a) sufficient to identify the location of all research facilities owned or leased by BioChemics and (b) reflecting the ownership, lease, sublease or other arrangements relating to any such facilities.

8.     All Documents Concerning Communications with Jefferies & Company, Inc., including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents or partners of such entity, including without limitation all Documents Concerning Communications with Annette Grimaldi.

9.     All Documents Concerning Communications with Collins Stewart Plc, including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents or partners of such entity, including without limitation all Documents Concerning Communications with Navid Mailik.

10.    All Documents Concerning investments in Biochemics by anyone with the name "Rockefeller" or "Hearst".

11.    All Documents Concerning Communications with Dominick and Dominick, or any of its principals, employees or agents.

12.    All Documents Concerning Communications with Seymour Pierce, or any of its principals, employees or agents.

13. All Documents Concerning Communications with AMRO bank, or any of its principals, employees or agents.

14. All Documents Concerning any agreements or proposed agreements with any investment bank or other entity Concerning a proposed or contemplated initial public offering of BioChemics' shares.

15. Documents sufficient to identify the start date, location, current status, number of patients enrolled, clinical trial protocol and estimated conclusion date of any clinical trial that was or is being conducted by or on behalf of BioChemics at any time after January 1, 2010.

16. All Documents Concerning VNA Holdings LLC.

17. All transcripts of any deposition or any other testimony taken in any lawsuit or legal proceeding Concerning BioChemics or VASO, including without limitation, In re: Vaso Active Pharmaceuticals, Inc., Debtor, In the United States Bankruptcy court for the District of Delaware (Case No. 10-10855(CSS)) and Vaso Active Pharmaceuticals, Inc. v. Robinson & Cole LLP (Suffolk Superior Court, Civil Action No. 06-4958).

18. All Documents Concerning BioChemics' revenue projections that were provided to potential investors of BioChemics, both in the format in which they were provided to the investor and in the native electronic format in which the projections were created.

19. All Documents Concerning payments made to any person or entity conducting clinical trials undertaken or planned by BioChemics, or other payments Concerning such clinical trials from January 1, 2010 to the present. Include without limitation, Documents reflecting the date, amount, and method of payment of such payments and all Documents supporting these payments, including without limitation copies of checks, electronic payment confirmations and wire transfers confirmations.

20. All bank account and brokerage account statements of BioChemics that cover the time period January 1, 2009 to the present. Specifically, produce all such bank and brokerage account monthly statements in electronic format such as spreadsheet or text delimited format, but if electronic format is not available, produce such statements in paper or PDF format.

21. All Documents Concerning all payments made by BioChemics to any person or entity from January 1, 2009 to the present, including but not limited to:

    a. A list, in electronic spreadsheet or text delimited format, listing:

        i. Payee,

        ii. Date of payment,

        iii. Amount of payment,

        iv. Method of payment (cash, cashiers check, check, wire, transfer, ACH, or other method of payment), and

        v. Reason for payment.

    b. Copies of front and back of canceled checks;

    c.  Wire and/or other electronic payment remittance confirmations, in both paper and electronic spreadsheet or text delimited format, as available.

22.   All Documents Concerning all payments made by VASO to John Masiz, including but not limited to:

    a.  A list, in electronic spreadsheet or text delimited format, listing:

        i.  date of payment,

        ii.  Amount of payment,

        iii.  Method of payment (cash, cashiers check, check, wire, transfer, ACH, or other method of payment), and

        iv.  Reason for payment.

    b.  Copies of front and back of canceled checks;

    c.  Wire and/or other electronic payment remittance confirmations, in both paper and electronic spreadsheet or text delimited format, as available.

23.   All Documents Concerning any grant received by BioChemics from any governmental agency, including but not limited to:

    a.  Documents sufficient to show:

        i.  the governmental agency from which the grant was received,

        ii.  the amount of grant,

        iii.  the date received,

        iv.  the reason for grant,

        v.  the contact person as governmental agency with whom BioChemics was dealing regarding the grant, and

        vi.  a description of use of proceeds of grant.

    b.  Copies of support that the payment received, such as, but not limited to, a copy of the deposited check, wire receipt detail, bank statement pages, or other documentation showing that the grant was received by BioChemics.

24.   Produce a full general ledger and the other accounting documents listed below for BioChemics in the native electronic format in which those accounting files are kept in the ordinary course of business. Specifically, provide:

    a.  A full general ledger for the period January 1, 2010 to the present

    b.  Monthly

        i.  Income statements,

        ii.  Balance sheets,

        iii.  Cash flow statements,

        iv.  Statements of shareholder equity; and

    c.  A trial balance as of December 31, 2010 and as of August 31, 2011.



# BROWN & BROWN OF NEW YORK, INC.
## INSURANCE AND BONDS

November 29, 2011

Biochemics, Inc.
99 Rosewood Drive-Suite 260
Danvers, MA 01923
Attn.: John Masiz

Re:  Coverage:   Directors & Officers Liability
     Carrier:    Axis Reinsurance Company
     Policy No:   RON764017012011
     Term:       11/13/11 to 11/13/12

Dear John Masiz:

Enclosed is the above captioned policy for the term 11/13/11 to 11/13/12.  We have reviewed
the policy and can confirm the coverage and limits are as proposed.  We ask that you also
review the policy and advise of any needed changes.

The annual premium is $46,250.00 including any tax and fees.  You are currently financing with
First Funding in installments.

Every insurance policy is subject to limitations and exclusions, please let me know if you have
any questions about your coverage and would like me to review it with you.

***Higher Limits may be Available.  Call to request a quotation***

Sincerely,
**BROWN & BROWN OF NEW YORK, INC.**

Lorraine Marotz, CIC
Vice President

/lm

Enclosure

# REMINDER

## THIS IS A

## CLAIMS MADE

### OR A

## CLAIMS MADE & REPORTED

### POLICY

**Read the policy carefully.**
**Professional Liability policies are not standardized.**

- Remember to report all claims to either your current or prior insurance company.
- Check the provisions of the policy for the proper name and address to whom to send your reports.
- Please send us a <u>copy</u> of any information you send to the insurance company.

# REMEMBER
## NOTICE TO S.H. SMITH & COMPANY
## IS **NOT** NOTICE TO THE COMPANY



**PRIVATUS®**
(Including Directors, Officers and Corporate Liability, Employment Practices Liability, Fiduciary Liability and Outside Directorship Liability Insurance)

## DECLARATIONS

THIS POLICY IS WRITTEN ON A CLAIMS MADE AND REPORTED BASIS AND COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE, AND REPORTED IN WRITING TO THE INSURER WITHIN THE TIME AND PURSUANT TO THE TERMS HEREIN.  THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY AMOUNTS INCURRED AS DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.

| COMPANY: AXIS Reinsurance Company | POLICY NUMBER: RON764017/01/2011 |
|---|---|

| | |
|---|---|
| Item 1.  Parent Company:<br>Biochemics, Inc _____ (Name)<br>99 Rosewood Drive _____ (Address)<br>Danvers, MA 01923 _____ (Address) | Item 2.  Policy Period:<br>a.  Inception Date  November 13, 2011<br>b.  Expiration Date  November 13, 2012<br>Both dates at 12:01 a.m. at the<br>address listed in Item 1 |

Item 3.  Limits of Liability:
  (A)  Maximum aggregate Limit of Liability for all Loss for all Claim(s)
       under all Insuring Agreements during the **Policy Period**         $ 5,000,000
  (B)  Maximum aggregate Sublimit of Liability for Internal Revenue
       Service fines, penalties and sanctions under Insuring Agreement C
       during the **Policy Period**                                        $ 100,000

Item 4.  Retentions:

  (A)  Each Claim:
       (i)    under each Insuring Agreement A         $ 50,000
       (ii)   under each Insuring Agreement B         $ 50,000
       (iii)  under each Insuring Agreement C         $ 0
       (iv)   under each Insuring Agreement D         $ 0
  (B)  No Retention shall apply for non-indemnifiable Loss under Insuring Agreements A and D

Item 5.  Extended Reporting Period:
  (A)  Additional Premium: 150 percent of annualized premium for the **Policy Period**
  (B)  Extended Reporting Period: One Year

| Item 6. Insuring Agreements Included and Effective at Inception<br>(check all that apply): | Item 7.  **Third Party Claim** Coverage<br>Included? |
|---|---|
| Section I. Insuring Agreement A (D&O):        Included ☒<br>Section I. Insuring Agreement B (EPL):        Included ☒<br>Section I. Insuring Agreement C (Fiduciary):  Included ☐<br>Section I. Insuring Agreement D (ODL):        Included ☐ | Yes ☒  No ☐ |

| Item 8.  Pending and Prior Claim Date: | Item 9.  Continuity Date: | |
|---|---|---|
| Section I. Insuring Agreement A:  October 31, 2005<br>Section I. Insuring Agreement B:  October 31, 2005<br>Section I. Insuring Agreement C:  Not Applicable<br>Section I. Insuring Agreement D:  Not Applicable | Section I. Insuring Agreement A:<br>Section I. Insuring Agreement B:<br>Section I. Insuring Agreement C:<br>Section I. Insuring Agreement D: | October 31, 2005<br>October 31, 2005<br>Not Applicable<br>Not Applicable |

| Item 10. | Notices to Insurer: | |
|---|---|---|
| | Notice of Claim(s) or Circumstances To Be Sent To: | All Other Notices To Be Sent To: |
| | Axis Financial Insurance Solutions Claims<br>Address: Connell Corporate Park<br>300 Connell Drive<br>P.O. Box 357<br>Berkeley Heights, NJ 07922-0357<br>Facsimile: (908) 508-4389 | Axis Financial Insurance Solutions<br>Address: Connell Corporate Park<br>300 Connell Drive<br>P.O. Box 357<br>Berkeley Heights, NJ 07922-0357<br>Facsimile: (908) 508-4301 |

| Item 11.  Endorsements Effective at Inception:<br>MU7042, PV4108, PV1028, PV1032, PV1033,<br>PV1035, PV1037, PV1039, PV1043, PV1048,<br>MU1032 | Item. 12.  Terrorism Coverage:<br>Coverage Purchased by **Parent Company**: Yes ☒ No ☐<br>If yes, Terrorism Coverage Premium:<br>No Separate Additional Charge |
|---|---|

The Insurer has caused this Policy to be signed and attested by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the **Insurer**.

_Jan Thibault_
Authorized Representative

November 17, 2011
Date


_Kevin J. Markowski_

**Kevin Markowski**
**President**

_Andrew Weissert_

**Andrew Weissert**
**Secretary**

**PRIVATUS®**
(INCLUDING DIRECTORS, OFFICERS AND CORPORATE LIABILITY, EMPLOYMENT PRACTICES LIABILITY, FIDUCIARY LIABILITY AND OUTSIDE EXECUTIVE LIABILITY INSURANCE)

In consideration of payment of the premium, and in reliance on all statements made in the Application for this Policy and all information provided to the Insurer, and subject to all the provisions of this Policy, the Insurer designated as such in the Declarations and the Parent Company, on behalf of all Insureds, agree as follows:

I.   INSURING AGREEMENTS

The Insurer shall pay in connection with a **Wrongful Act** as appropriate per the Insuring Agreements below, which takes place before or during the **Policy Period**:

DIRECTORS, OFFICERS AND CORPORATE LIABILITY
(A)   all **Loss** on behalf of any **Insured** arising from any **D&O Claim** for a **Wrongful Act**, other than a **Wrongful Act** while serving in an **Outside Position**, first made against such **Insured**;

EMPLOYMENT PRACTICES LIABILITY
(B)   all **Loss** on behalf of any **Insured** arising from any:

   (1)   **Employment Practice Claim** for a **Wrongful Act** first made against such **Insured** by or on behalf of any **Employee**; or

   (2)   **Third Party Claim** for a **Wrongful Third Party Act** first made against such **Insured**, but solely if such coverage is purchased and marked as "included" in Item 7 of the Declarations;

FIDUCIARY LIABILITY
(C)   all **Loss** on behalf of any **Insured** arising from any **Fiduciary Claim** for a **Wrongful Act** first made against such **Insured**; or

OUTSIDE EXECUTIVE LIABILITY
(D)   all **Loss** on behalf of any **Insured Individual** arising from any **D&O Claim** for a **Wrongful Act** while serving in an **Outside Position** first made against such **Insured Individual**;

during the **Policy Period** or Extended Reporting Period, if applicable, and reported in writing to the Insurer as soon as practicable after any of the Policyholder's **Executive Officers** first becomes aware of such **Claim**, but in no event later than sixty (60) days after the expiration of the **Policy Period** or Extended Reporting Period, if applicable.

Coverage under each Insuring Agreement above shall only be included in this Policy if such Insuring Agreement is marked as "included" in Item 6 of the Declarations.

II.   COVERAGE EXTENSIONS

A.   Spouses

If a **Claim** made against an **Insured Individual** includes a claim against the **Insured Individual**'s lawful spouse solely by reason of (1) such spouse's status as a spouse of the **Insured Individual**, or (2) such spouse's ownership interest in property from which the claimant seeks recovery for the **Wrongful Acts** of the **Insured Individual**, all loss which such spouse becomes legally obligated to pay on account of such claim will be treated for purposes of this Policy as **Loss** which the **Insured Individual** is legally obligated to pay on account of the **Claim** made against the **Insured Individual**. Such loss shall be covered under this Policy only if and to the extent that such loss would be covered under this Policy if incurred by the **Insured Individual**.

The coverage extension afforded by this Subsection does not apply to any **Claim** alleging any wrongful act or omission by an **Insured Individual**'s spouse. The term "spouse" as used in this paragraph shall include any natural person qualifying as a domestic partner under the provisions of any applicable federal, state of local law in the United States of America.

B.   Estates and Legal Representatives

Coverage under this Policy shall extend to a Claim made against the estates, heirs, legal representatives or assigns of an Insured Individual who is deceased or against the legal representatives or assigns of an Insured Individual who is incompetent, insolvent or bankrupt for the Wrongful Acts of such Insured Individual.

The coverage extension afforded by this Subsection does not apply to any Claim alleging any wrongful act or omission by the Insured Individual's estates, heirs, legal representatives or assigns.

C.   Extended Reporting Period

If the Insurer chooses not to renew or the Parent Company cancels or non renews this Policy, the Policyholder or the Insured Individuals shall have the right, upon payment of the additional premium required by the Insurer in Item 5(A) in the Declarations, to a one year Extended Reporting Period following the termination of the Policy Period, but only with respect to Wrongful Acts occurring prior to the effective date of cancellation or nonrenewal.

The right to purchase the Extended Reporting Period shall not be available in the event of non-renewal or cancellation of this Policy resulting from the failure to pay any premium due. The offer of renewal terms, conditions or premiums different from those in effect prior to renewal shall not constitute a refusal to renew.

This right to elect any Extended Reporting Period shall lapse unless written notice of the of the election, together with payment of the additional premium due, is given by the Policyholder or Insured Individual and is received by the Insurer within sixty (60) days following the effective date of cancellation or nonrenewal, as appropriate. Coverage under the Extended Reporting Period shall apply only to a Claim that is first made against the Policyholder or Insured Individual during the Extended Reporting Period and any Claim made during the Extended Reporting Period shall be deemed to have been made during the immediately preceding Policy Period. The Limit of Liability applicable to the Extended Reporting Period shall be part of, and not in addition to, the Limit of Liability for the immediately preceding Policy Period.

## III. DEFINITIONS

A.   Definitions Applicable To the Coverage Afforded Under All Section I. Insuring Agreements:

The following definitions apply to all Insuring Agreements under this Policy:

1.   **Application** means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other such documents submitted in connection with the underwriting of this policy or of which this policy is a renewal, replacement or which succeed it in time.

2.   **Defense Costs** means reasonable and necessary legal fees and expenses (other than regular or overtime wages, salaries, fees or benefits of the Insured Individuals or Employees of the Policyholder or the Policyholder's overhead expenses) incurred by or on behalf of the Insureds in defending, settling, appealing or investigating Claims, and the premiums for appeal, attachment or similar bonds. The Insurer, however, shall have no obligation to furnish such bonds.

3.   **Employee** means any one or more natural persons who are past, present or future:

    a.   duly appointed officer of the Policyholder;

    b.   individuals whose labor or service is directed by the Policyholder, whether such labor or service is on a part-time, temporary, seasonal, or full-time basis;

    c.   leased employees and volunteers whose labor or service is directed solely by the Policyholder;

    d.   applicants for prospective employment by the Policyholder; or

    e.    any individual contracted to perform work for the Policyholder or who is an independent contractor for the Policyholder, but only if such individual performs work or services solely for or on behalf of the Policyholder.

4.    **Executive Officer** means any one or more natural persons who are a past, present or future chairperson of the board of directors, president, chief executive officer, chief operating officer, chief financial officer, In-house general counsel, human resource manager or risk manager of the Policyholder or the functional equivalent of any such positions.

5.    **Financial Impairment** means:

    a.    the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the Policyholder; or

    b.    the Policyholder becoming a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law.

6.    **Interrelated Wrongful Acts** means any and all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes.

7.    **Loss** means the amount(s) which the Insureds become legally obligated to pay on account of a **Claim**, including damages, judgments, any award of pre-judgment and post-judgment interest, settlement amounts, costs and fees awarded pursuant to judgments, and **Defense Costs**.

Loss does not include:

    a.    fines, penalties, or taxes imposed by law, except for:

        (i)    the five (5) percent or less civil penalty imposed upon an **Insured** under Section 502(i) of the Employee Retirement Income Security Act of 1974, including any amendments thereto, ("ERISA");

        (ii)    the twenty (20 ) percent or less penalty imposed upon an **Insured** under Section 502(l) of ERISA;

        (iii)    fines, penalties or sanctions imposed upon an **Insured** pursuant to the Internal Revenue Service's Voluntary Compliance Resolution Program, Closing Agreement Program, or Tax Sheltered Annuity Voluntary Correction program, subject always to the Sublimit of Liability set forth in Item 3(C) in the Declarations; or

        (iv)    penalties or other awards imposed by the Pension Ombudsman of England or Occupational Pensions Regulatory Authority of England pursuant to the English Pension Scheme Act 1993, the English Pensions Act 1995, as amended, and any rules and regulations promulgated thereunder, provided always that no part of the premium for this Policy attributable to this exception has been funded, paid or reimbursed from the funds or assets or any pension scheme insured under this Policy;

    with respect to covered settlements or judgments in a **Fiduciary Claim** arising under Section I. Insuring Agreement C; or

    b.    matters uninsurable under the law pursuant to which this Policy shall be construed.

    However, in determining the insurability of punitive or exemplary damages, or the multiplied portion of any multiplied damage award, other than as excluded in Subsection III.A7.b., it is agreed that the law of the jurisdiction most favorable to the insurability of those damages will control for purposes of resolving any dispute between the Insurer and the Insureds, provided that such jurisdiction is:

        (i)    where the punitive, exemplary or multiplied damages were awarded or imposed;

        (ii)    where the **Wrongful Act** or **Wrongful Third Party Act** underlying the **Claim** took place;

    (iii)   where either the Insurer or any Insured is incorporated, has its principal place of business or resides; or

    (iv)   where the Policy was issued or became effective.

8.    **Manager** means any one or more natural persons who are a past, present or future manager, managing member, member of the board of managers or equivalent executive of a Policyholder that is a limited liability company.

9.    **Non-Profit Entity** means any non-profit corporation, community chest, fund or foundation that is not included in the definition of Policyholder and that is: (a) exempt from federal income tax as an organization described in section 501(c)(3) of the Internal Revenue Code of 1986, as amended; or (b) organized for a religious or charitable purpose under any non-profit organization statute.

10.    **Outside Entity** means:

    (a)   any **Non-Profit Entity**; or

    (b)   any other entity, if **Outside Position** coverage under Section I. Insuring Agreement D with respect to such entity is specifically granted by endorsement to this Policy.

11.    **Outside Position** means the position of director, officer, trustee or other equivalent executive position held by any **Insured Individual** in an **Outside Entity** if service in such position is at the specific request of the **Policyholder**.

12.    **Parent Company** means the company designated in Item 1 in the Declarations.

13.    **Policyholder** means:

    a.   the **Parent Company** and its **Subsidiaries**, including any such organization as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law; and

    b.   any foundation or charitable trust controlled by the **Parent Company** and/or its **Subsidiaries**.

14.    **Policy Period** means the period of time specified in Item 2 in the Declarations, subject to prior termination in accordance with Section VIII.C.

15.    **Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by or identified on a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipality or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, mold, spores, fungi, germs, chemicals or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil product, infectious or medical waste, asbestos or asbestos product, lead or lead product, noise, and electric, magnetic or electromagnetic field.

16.    **Subsidiary(ies)** means any entity in which and so long as the **Parent Company**, either directly or indirectly:

    a.   owns more than 50% of the issued and outstanding voting securities; or

    b.   controls voting rights representing the present right to elect or to appoint more than fifty (50) percent of the directors or trustees;

on or before the effective date of this Policy, or after the effective date of this Policy if the entity is covered pursuant to Section VIII. A. 1, solely with regard to **Wrongful Acts** occurring at or after the time such entity became a **Subsidiary**.

B. Definitions Applicable To The Coverage Afforded Under Section I. Insuring Agreements A and D, Directors, Officers and Corporate Liability and Outside Executive Liability:

With respect to Insuring Agreements A and D the following definitions shall apply:

1.   **Claim** means any **D&O Claim**.

2.   **D&O Claim** means:

    a.   a written demand against an **Insured** for monetary or non-monetary relief;

    b.   a civil, arbitration, administrative or regulatory proceeding against any **Insured** commenced by:
        (i)   the service of a complaint or similar pleading;
        (ii)  the filing of a notice of charge, investigative order or like document; or
        (iii) written notice or subpoena from an authority identifying such **Insured** as an entity or person against whom a formal proceeding may be commenced; or

    c.   a criminal investigation or proceeding against any **Insured Individual** commenced by:
        (i)   the return of an indictment, information, or similar pleading; or
        (ii)  written notice or subpoena from an authority identifying such **Insured Individual** as an individual against whom a formal proceeding may be commenced.

3.   **Insured** means the **Insured Individual** and the **Policyholder**.

4.   **Insured Individual** means any one or more natural persons who are past, present or future:

    a.   duly elected or appointed director(s), officer(s), trustee(s) or **Manager(s)** of the **Policyholder** or their functional equivalents if serving in such a position outside the United States;

    b.   management committee members of a joint venture which is a **Subsidiary**; or

    c.   **Employees**, other than independent contractors, who are named in any **D&O Claim**;

    provided always that, with regard to paragraph III. B. 4. c. above, such **Employees** shall not be considered **Insureds** for the purposes of Exclusion IV. B. 1.b.

5.   **Wrongful Act** means:

    a.   any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by:

        (i)   any **Insured Individual** in their capacity as such;

        (ii)  any **Insured Individual** in an **Outside Position** with respect to Section I. Insuring Agreement D; or

        (iii) the **Policyholder** with respect to Section I. Insuring Agreement A; or

    b.   any matter claimed against any **Insured Individual** solely by reason of their serving in their capacity as such or in an **Outside Position** with respect to Section I. Insuring Agreement D.

C.   Definitions Applicable To The Coverage Afforded Under Section I. Insuring Agreement B, Employment Practices Liability:

With respect to Insuring Agreement B. the following definitions shall apply:

1.   **Breach of Employment Contract** means a breach of any oral, written or implied employment contract.

2.    Claim means any Employment Practice Claim. If Third Party Claim Coverage is included in Item 7 in the Declarations, Claim shall include a Third Party Claim.

3.    Discrimination means the violation of any Federal, State, or local statute, regulation, ordinance or common law concerning discrimination in employment anywhere in the world.

4.    Employment Benefits means perquisites, fringe benefits, deferred compensation or payments (including insurance premiums) in connection with an employee benefit plan and any other payment to or for the benefit of an employee arising out of the employment relationship. Employment Benefits shall not include salary, wages, commissions or non-deferred cash incentive compensation.

5.    Employment Practices Claim means:

    a.    a written demand against any Insured for monetary or non-monetary relief;

    b.    a civil proceeding against any Insured commenced by the service of a complaint or similar pleading;

    c.    a formal, administrative, investigative or regulatory proceeding by or before the Equal Employment Opportunity Commission (EEOC), the Office of Federal Contract Compliance Programs (OFCCP), or similar formal proceeding before another federal, state or other governmental agency against any Insured commenced by a notice of charges, formal investigative order or similar document; or

    d.    an arbitration or other alternative dispute resolution proceeding against any Insured commenced by a written demand or notice.

The term Employment Practices Claim shall not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement. If Third Party Claim Coverage is purchased and marked as "included" in Item 7 in the Declarations, Employment Practices Claim shall include Third Party Claim Coverage.

6.    Insured means the Insured Individual and the Policyholder.

7.    Insured Individual means any one or more natural persons who are past, present or future:

    a.    duly elected or appointed director, officer, trustee, or Manager of the Policyholder or their functional equivalent if serving in such a position outside the United States;

    b.    individuals compensated by the Policyholder through wages, salary and/or commissions and whose labor or service is directed by the Policyholder, whether such labor or service is on a part-time, temporary, seasonal, or full-time basis;

    c.    volunteers whose labor or service is directed by the Policyholder;

    d.    individuals leased to the Policyholder, but only if prior to any Claim against such individual the Policyholder has agreed in writing to indemnify such individual or the company leasing that individual for matters within the scope of coverage of the Policy; or

    e.    individuals contracted to perform work for the Policyholder or who is an independent contractor for the Policyholder, but only if prior to any Claim against such individual the Policyholder has agreed in writing to indemnify such individual for matters within the scope of coverage of this Policy.

8.    Harassment means:

    a.    work related sexual harassment that interferes with an Employee's performance or creates an intimidating, hostile or offensive working environment;

    b.    sexual advances, requests for sexual favors, or other conduct of a sexual nature that is made a condition of employment or that is used as a basis for employment decisions; or

     c.   illegal work related harassment.

9.   **Other Workplace Tort** means

    a.   an employment related misrepresentation to an employee;

    b.   failure to grant or adopt adequate employment related policies and procedures;

    c.   negligent hiring, supervision, evaluation or retention of employees;

    d.   employment-related invasion of privacy or defamation;

    e.   employment-related wrongful infliction of emotional distress; or

    f.   employment-related libel, slander, false arrest, detention, or imprisonment;

but only when alleged as part of **a Employment Practices Claim** for an actual or alleged **Breach of Employment Contract, Discrimination, Harassment, Retaliation, or Wrongful Job Action**

10.   **Retaliation** means the illegal retaliatory treatment of **Employees**, including any retaliatory treatment against an **Employee** for such **Employee** engaging in any of the following activities:

    a.   exercising his or her rights under the law;

    b.   refusing to violate any law or opposing an unlawful practice;

    c.   threatening to disclose or actually disclosing violations of the law to any governmental authority or the management of the **Policyholder**; or

    d.   testifying, cooperating, or assisting with respect to an investigation or proceeding by a governmental authority against the **Policyholder**.

11.   **Third Party Claim** means any **Employment Practices Claim** brought and maintained against any **Insured** by or on behalf of any natural person(s) who is, or attempted to be, a past, present or future customer(s) or vendor(s), or an employee of customer(s) or vendor(s) of the **Policyholder** for any **Wrongful Third Party Act**.

12.   **Wrongful Act** means any **Breach of Employment Contract, Discrimination, Harassment, Retaliation, Wrongful Job Action, or Other Workplace Torts** actually or allegedly committed or attempted by:

    a.   the **Policyholder**;

    b.   any **Insured Individuals** in their capacities as such; or

    c.   by any other persons for whom the **Insureds** are legally responsible.

13   **Wrongful Job Action** means wrongful:

    a.   dismissal, discharge or termination (either actual or constructive) of employment;

    b.   wrongful failure to employ or promote;

    c.   wrongful reference, discipline or deprivation of a career opportunity; or

    d.   wrongful demotion or adverse change in the terms, conditions or status of employment.

14.   **Wrongful Third Party Act** means any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by:

a. the Policyholder;

b. any Insured Individuals in their capacities as such; or

c. any other persons for whom the Insureds are legally responsible;

which discriminates against any natural person who is a customer or vendor, or employee of a customer or vendor, of the Policyholder on the basis of that natural person's race, color, creed, national origin, gender, sexual orientation or preference, marital status, sex, religion, age, military service, disability or handicap, pregnancy, or on any other basis prohibited by law, including the sexual or other discriminatory harassment of such customer or vendor or employee of such customer or vendor; provided, however, that a Wrongful Third Party Act does not include, in whole or in part:

    y. any actual or alleged battery or bodily injury (other than mental anguish, humiliation or emotional distress); or

    z. any actual or alleged price discrimination or violation of any antitrust statute or other law proscribing unfair competition or unfair business practices.

D. Definitions Applicable To The Coverage Afforded Under Section I. Insuring Agreement C, Fiduciary Liability:

With respect to Insuring Agreement C, the following definitions shall apply:

1. **Administrator** means an Insured Individual with responsibility for the performance of one or more of the following administrative duties or activities:

    a. counseling participants or beneficiaries with respect to a Plan,

    b. providing interpretations with respect to a Plan,

    c. handling of records with respect to a Plan, or

    d. activities affecting enrollment, termination, amendment or cancellation of participants or beneficiaries under the Plan.

Administrator also means any third party which is included in the definition of Administrator by written endorsement attached hereto, but only with respect to a Plan.

2. **Benefits** means any obligation under a Plan to a participant or beneficiary under a Plan which is a payment of money or property or the grant of a privilege or perquisite.

3. **Claim** means any Fiduciary Claim.

4. **ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985), and any amendment or revision thereto, or any similar common or statutory law of the United States, Canada or any state or other jurisdiction to which a Plan is subject. ERISA shall not include any law concerning worker's compensation, unemployment insurance, Social Security, government mandated disability benefits or similar law.

5. **ESOP** means any employee stock ownership plan as defined in ERISA.

6. **Fiduciary(ies)** means a fiduciary(ies) of a Plan as defined in ERISA.

7. **Fiduciary Claim** means:

    a. a written demand against any Insured for monetary or non-monetary relief,

    b. a civil, arbitration, administrative or regulatory proceeding against any Insured commenced by:

        (i) the service of a complaint or similar pleading,

        (ii) the filing of a notice of a charge, investigative order or like document, or

        (iii) written notice or subpoena from an authority identifying such Insured as an entity or person against whom a formal proceeding may be commenced,

    c. a criminal proceeding against any Insured commenced by:

      (i)      the return of an indictment, information, or similar pleading, or

      (ii)     written notice or subpoena from an authority identifying such Insured as an Individual or entity against whom a subsequent formal proceeding may be commenced, or

   d.    any fact-finding investigation by the Department of Labor, the Pension Benefit Guaranty Corporation, or similar governmental agency located outside the United States.

8.    **Insured** means any of the **Insured Individuals**, the **Policyholder** (including any general or limited partnership scheduled by written endorsement hereto) and any **Plan**. **Insured** shall also include any natural person in the capacity of **Fiduciary** or **Administrator** of a **Plan** if such person is scheduled by written endorsement attached hereto.

9.    **Insured Individual** means any one or more natural persons who are past, present or future duly elected or appointed director(s), officer(s), **Managers** or employee(s) of the **Policyholder** or a **Plan** (including a general partner(s) of a general or limited partnership scheduled by written endorsement attached hereto) or his or her functional equivalent if serving in such a position outside the United States, in his or her capacity as a **Fiduciary** or **Administrator** of a **Plan**.

10.   **Plan** means any plan, fund or program, regardless of whether it is subject to regulation under Title I of ERISA or any part thereof, or meets the requirements for qualification under Section 401 of the Internal Revenue Code of 1986, as amended, and which is:

   a.    a welfare plan, as defined in **ERISA**, sponsored solely by the **Policyholder** or sponsored jointly by the **Policyholder** and a labor organization, solely for the benefit of the employee(s) of the **Policyholder**,

   b.    a pension plan, as defined in **ERISA** (other than an **ESOP**), sponsored solely by the **Policyholder** or sponsored jointly by the **Policyholder** and a labor organization, solely for the benefit of the employee(s) of the **Policyholder**, provided that prior to the inception date of this Policy, such plan has been reported in writing to the Insurer pursuant to the terms of the Application for this Policy or pursuant to the terms of any prior policy issued by the Insurer or the Application for such policy and the **Policyholder** shall have paid any premium required for such plan,

   c.    a pension plan, as defined in **ERISA** (other than an **ESOP**), which, during the **Policy Period**, becomes sponsored solely by the **Policyholder** or sponsored jointly by the **Policyholder** and a labor organization, solely for the benefit of the employee(s) of the **Policyholder**,

   d.    a plan which is both a welfare plan and a pension plan as defined in **ERISA** (other than an **ESOP**),

   e.    a government-mandated program for unemployment insurance, social security or disability benefits solely with respect to a **Wrongful Act** as defined in Subsection III.D.11.b.,

   f.    an **ESOP** which is included in the definition of **Plan** by written endorsement attached hereto, or

   g.    any other plan, fund or program, including a multi-employer plan(s) solely with respect to a **Wrongful Act** as defined in Subsection III.D.11.c., which is included in the definition of **Plan** by written endorsement attached hereto.

Pursuant to the requirements of paragraphs a. and b. above, coverage under this Policy shall apply to any pension or welfare plan that was merged, sold, spun-off or terminated prior to or during the **Policy Period** with respect to **Wrongful Acts** that occurred prior to the date of such merger, sale or spin-off or prior to the final date of asset distribution of such plan. As a condition precedent to coverage with respect to any such pension or welfare plan, the **Policyholder** shall give written notice of such transaction to the Insurer as soon as practicable but in no event more than ninety (90) days after the effective date of such merger, sale, spin-off or termination.

Pursuant to the requirement of paragraph c. above, if the total assets of such newly sponsored **Plan** are greater than twenty-five (25) percent of the total consolidated assets of the existing **Plans** of the **Policyholder**, this Policy shall provide insurance for such plan for a period of ninety (90) days after the effective date of such sponsorship.

11.   **Wrongful Act** means:

   a.    as respects a **Fiduciary**, a **Plan** or the **Policyholder**:

(i)     a violation of any of the responsibilities, obligations or duties imposed on **Fiduciaries** by ERISA with respect to a **Plan**, or

(ii)     any matter claimed against a **Insured** by reason of his, her or its status as a **Fiduciary**,

b.     as respects an **Administrator**:

(i)     any act error or omission in the performance of his or her administrative duties as defined in Subsection III.D.1., or

(ii)     any matter claimed against an **Administrator** by reason of his or her status as such, and

c.     as respects a **Insured Individual**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or **Administrator** of any multi-employer plan as defined by ERISA, but only if such service is at the specific request of the **Policyholder** and such multi-employer plan is added pursuant to Subsection III.D.10.g., identified as a multi-employer plan and any required premium is paid.

## IV.  Exclusions

A.     Exclusions Applicable To All Section I. Insuring Agreements:

The Insurer shall not be liable for **Loss** arising from any **Claim** made against any **Insured**:

1.     based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any fact, circumstance, transaction, event or **Wrongful Act** which before the Inception Date set forth in Item 2 of the Declarations, was the subject of any notice of claim, loss or notice of potential claim or potential loss given under any other policy of insurance of which this policy is a direct or indirect renewal or replacement;

2.     based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

a.     any demand, suit or other proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the applicable Pending or Prior Claim Date set forth in Item 8 in the Declarations, or any **Wrongful Act**, fact, circumstance or situation underlying or alleged therein; or

b.     any other **Wrongful Act** whenever occurring, which together with a **Wrongful Act** described in a. above, constitute **Interrelated Wrongful Acts**;

3.     for bodily injury, mental anguish, emotional distress, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof, but this exclusion shall not apply with respect to any actual or alleged mental anguish or emotional distress in a **Employment Practices Claim** for a **Wrongful Act**, solely as that term is defined in Section III.C.12., brought by an **Employee**;

4.     for:

a.     any nuclear reaction, radiation or contamination;

b.     the actual, alleged or threatened discharge, release, escape, seepage, migration, dispersal or disposal of **Pollutants** into or on real or personal property, water or the atmosphere; or

c.     any direction or request that the **Insureds** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so (such cost hereinafter "Clean Up Costs");

however, this Exclusion IV. A. 4. shall not apply to the extent such **Claim**:

(a)     is made against a **Insured Individual**, otherwise covered under Section I. Insuring Agreement A, and the **Loss** incurred by such **Insured Individual** in connection with such **D&O Claim** is not permitted or required to be indemnified by the **Policyholder**, or the **Policyholder** is permitted or required to indemnify but does not do so by reason of Financial

Impairment;

(b) is brought by or on behalf of any securities holder(s) of the Policyholder in their capacity as such, while acting totally independent of and without the solicitation, assistance, participation or intervention of the Policyholder or any Insured Individual; or

(c) is brought by an Employee for Retaliation;

5. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

a. the gaining of any profit, remuneration, or advantage to which the Insured was not legally entitled; or

b. any criminal or deliberately fraudulent act, error or omission by an Insured;

if evidenced by any judgment, final adjudication, alternate dispute resolution proceeding or a document or written statement by an Insured.

With respect to exclusion A. 5. set forth above no fact pertaining to, knowledge possessed by or conduct by any Insured Individual shall be imputed to any other Insured Individual.

B.   Exclusions Applicable To Section I. Insuring Agreements A and D, Directors, Officers and Corporate Liability and Outside Executive Liability:

The following exclusions apply to Insuring Agreements A and D of this Policy:

The Insurer shall not be liable for Loss arising from any Claim made against any Insured:

1. brought or maintained by or on behalf of any Insured except a Claim:

a. that is a derivative action brought or maintained on behalf of the Policyholder by one or more persons who are not Insured Individuals and who bring and maintain the Claim totally independent of and without the solicitation, assistance, participation, or intervention of any Insured;

b. that alleges a Wrongful Act, solely as that term is defined in Section III.C.12., and is brought by an Employee, but such Claim shall only be subject to coverage under Section I. Insuring Agreement B;

c. brought or maintained by any Insured Individual for contribution or indemnity, if the Claim directly results from another Claim covered under this Policy;

d. brought or maintained by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator or rehabilitator for a Policyholder, or any assignee of such receiver, trustee, examiner, conservator, liquidator or rehabilitator;

e. brought or maintained by one or more Insured Individuals who have not served as directors, trustees, Managers, officers, or equivalent executives of the Policyholder within five (5) years immediately preceding the date the Claim is first made, and the Claim is brought and maintained totally independent of and without the solicitation, assistance, active participation, or intervention of the Policyholder or any Insured Individual not described in this paragraph e; or

f. brought or maintained outside the United States, Canada and any common law jurisdiction;

2. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 and amendments thereto or similar provisions of any federal, state or local statutory law or common law or the equivalent law of any other country in connection with any pension, profit sharing, health and welfare or other employee benefit plan or trust established or maintained for the purpose of providing benefits to employees of the Policyholder; or

3.  based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving the actual or alleged violation of any the Securities Act of 1933, Securities Exchange Act of 1934, Investment Act of 1940, any state "blue sky" securities laws; provided that this Exclusion B. 3. shall not apply to any D&O Claim arising out of the offering, sale or purchase of securities, whether debt or equity, in a transaction or series of transactions that are exempt from registration under the Securities Act of 1933 and any amendments thereto or any rules or regulations promulgated thereunder; or

4.  for any **Third Party Claim** for a Wrongful **Third Party Act** as such terms are defined in Section III C.

C.  Exclusions Applicable To Section I. Insuring Agreement A, Directors, Officers and Corporate Liability:

The following exclusions apply to Insuring Agreement A of this Policy.

The Insurer shall not be liable for **Loss** arising from any **Claim** made against the Policyholder:

1.  for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, service mark, trademark, trade secret or any other intellectual property rights;

2.  based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged contractual liability of the Policyholder under any express contract or agreement; or

3.  for the rendering of or failure to render any service to a customer or client.

D.  Exclusions Applicable to Section I. Insuring Agreement B, Employment Practices Liability:

The following exclusions apply to Insuring Agreement B. of this Policy.

The Insurer shall not be liable for **Loss** arising from any **Claim** made against any **Insured**:

1.  based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any action that relates to a collective bargaining agreement;

2.  based upon, arising from, or in consequence of the liability of others assumed by any **Insured** under any written or oral contract or agreement; provided that this Exclusion A. 2 shall not apply to the extent that an **Insured** would have been liable in the absence of such a contract or agreement;

3.  for an actual or alleged violation of the responsibilities, obligations or duties imposed by the following laws and any amendments thereto:

    (a) any law governing workers' compensation, unemployment insurance, social security, disability benefits or similar law;

    (b) the Employee Retirement Income Security Act of 1974 (except Section 510 thereof) or any law that governs any employee benefit arrangement, program, policy, plan or scheme of any type (whether or not legally required or whether provided during or subsequent to employment with the Policyholder);

    (c) the Fair Labor Standards Act or any law that governs wage, hour or payroll policies and practices, except the Equal Pay Act;

    (d) the National Labor Relations Act or any law that pertains to the rights of employees with respect to unions, unionizing, or collective activities in the workplace or any obligations of employers with respect to such employee activities;

    (e) the Worker Adjustment and Retraining Notification Act, or any law that governs any obligation of an employer to notify, discuss, or bargain with its employees or others in advance of any plant or facility closing, or mass layoff or any similar obligation;

    (f) the Consolidated Omnibus Budget Reconciliation Act of 1985;

(g) the Federal False Claims Act or any similar federal, state, or local statutory law or common law anywhere in the world; or

(h) the Occupational Safety and Health Act or any law that governs workplace safety and health;

including any other federal, state local or foreign statute or law similar to any statute or law described in (a) through (h) of this exclusion, or rules or regulations promulgated under any of such statutes or laws; provided however this Exclusion D. 3. shall not apply to any **Claim** for **Retaliation**;

4.  made against a **Subsidiary** or an **Insured Individual** of such **Subsidiary** for any **Wrongful Employment Practices Act** committed, attempted, or allegedly committed or attempted during anytime when such entity was not a **Subsidiary**;

5.  for any actual or alleged breach of any express contract between the **Policyholder** and an independent contractor of the **Policyholder**; or

6.  for any actual or alleged charge of contempt of court or violation of a court order; or

7.  based upon, arising from, or in consequence of any federal, state, or local statutory law or common law anywhere in the world that governs competition, monopolistic practices, or price fixing (including horizontal or other price fixing of wages, hours, salaries, compensation, benefits or any other terms and conditions of employment), including but not limited to the Interstate Commerce Act of 1887, the Sherman Antitrust Act of 1890, the Clayton Act of 1914, the Robinson-Patman Act of 1936, the Cellar-Kefauver Act of 1950, the Federal Trade Commission Act of 1914, or amendments to or regulations promulgated under any such law; or

E.  **Exclusions Applicable Solely To Loss other than Defense Costs under Insuring Agreement B**

The following exclusions apply to Insuring Agreement B of this Policy.

With respect to **Employment Claims** not excluded by Section IV Exclusions D of the Policy, the Insurer shall only pay Defense Costs, and not other components of Loss, on account of any **Claim** made against any **Insured**, for:

1.  amounts which constitute **Employment Benefits** due or to become due or the equivalent value of such Benefits; provided that this Exclusion E. 1. shall not apply to any **Employment Claim** for **Wrongful Termination**;

2.  amounts which constitute costs associated with providing any accommodation for persons with disabilities or any other status which is protected under any applicable federal, state, or local statutory law or common law anywhere in the world, including but not limited to the Americans With Disabilities Act, the Civil Rights Act of 1964, or amendments to or rules or regulations promulgated under any such law;

3.  the recovery of amounts owing under or assumed by any **Insured** pursuant to any express written employment contract or agreement with any **Employee**; provided, however, this exclusion shall not apply to the extent the **Insured** would be liable for such amounts in the absence of such contract or agreement; or

4.  any request order (including the cost of compliance with such order) or agreement for non-monetary relief including injunctive relief, declaratory relief, restitution, or any other equitable remedy.

F.  Exclusions Applicable to Section I. Insuring Agreement C, Fiduciary Liability:

The following exclusions apply to Insuring Agreement C of this Policy.

1.  The Insurer shall not be liable for Loss arising from any **Claim** made against any **Insured**:

    a.  based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any act or omission in his, her or its capacity as a **Fiduciary** or **Administrator** of any plan,

fund or program other than a Plan as defined in this Policy, or by reason of his, her or its status as a Fiduciary or Administrator of such other plan, fund or program; or

b.   based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving to any Wrongful Act as respects a Plan taking place at any time when the Policyholder did not sponsor such Plan.

2.   The Insurer shall only pay Defense Costs, and not Indemnity Amounts, for any Claim made against any Insured for:

a.   the failure to collect contributions owed to any Plan from any employer unless such failure is due to the negligence of an Insured; or

b.   Benefits, including that portion of any settlement or judgment equal to such Benefits, unless recovery of such Benefits is based on a Wrongful Act and is payable as a personal obligation of an Insured Individual.

## V.   LIMITS OF LIABILITY, RETENTION, DEFENSE AND SETTLEMENT

### A.   Limits of Liability

The Insurer's maximum aggregate liability for all Loss arising from all Claims, under all Insuring Agreements, first made during the Policy Period shall be the Limit of Liability set forth in Item 3(A) in the Declarations. As respects Insuring Agreement C, the Insurer's maximum aggregate liability for Internal Revenue Service fines, penalties and sanctions shall be the Sublimit of Liability set forth in Item 3(B) in the Declarations, which amount shall be part of and not in addition to the Limit of Liability set forth in Item 3(A) in the Declarations.

The Limits of Liability for the Extended Reporting Period, if exercised, shall be part of and not in addition to the Limits of Liability for the immediately preceding Policy Period. The purchase of the Extended Reporting Period shall not increase or reinstate the Limits of Liability, which shall be the maximum liability of the Insurer for such Policy Period and Extended Reporting Period, combined.

If the Limits of Liability are exhausted by payment of Loss, the Insurer's obligations under this Policy shall be completely fulfilled and extinguished.

All Claims, including all D&O Claims, Employment Practices Claims, Third Party Claims and Fiduciary Claims, arising from the same Wrongful Act, Wrongful Third Party Act, and all Interrelated Wrongful Acts shall be deemed one Claim and such Claim shall be deemed to be first made on the earlier date that: (1) any of the Claims is first made against an Insured under this Policy or any prior policy, or (2) valid notice was given by the Insureds under this Policy or any prior policy of any Wrongful Act, Wrongful Third Party Act, or any fact, circumstance, situation, event, transaction or cause which underlies such Claim. Coverage under this Policy shall apply only with respect to Claims deemed to have been first made during the Policy Period and reported in writing to the Insurer in accordance with the terms herein.

### B.   Retentions

The Insurer shall be liable for only that part of Loss arising from a Claim under Section I. Insuring Agreement A, B, C or D., which is excess of the Retention set forth in Item 4(A) in the Declarations, and such Retention shall be borne by the Insureds uninsured and at their own risk.

In the event that a Claim falls under more than one Section 1. Insuring Agreement, the larger Retention set forth in Item 4 of the Declarations shall apply to such Claim.

### C.   Defense

The Insurer shall have both the right and the duty to defend and appoint counsel with respect to any Claim made against the Insureds alleging a Wrongful Act, even if such Claim is groundless, false or fraudulent. The Insureds shall have the right, at their own expense, to associate with the Insurer in the defense of any Claim, including but not limited to negotiating a settlement. However, the Insurer shall not be obligated to defend any Claim after the Limit of Liability set forth in Item 3(A) in the Declarations has been exhausted or after the rejection of a settlement offer as described below.

D.    Consent, Cooperation and Settlement

The Insureds shall not settle any Claim, select any defense counsel, incur any Defense Costs, admit or assume any liability, stipulate to any judgment, or otherwise assume any obligation without the Insurer's prior written consent, which shall not be unreasonably withheld. The Insurer shall not be liable for any settlement, Defense Costs, assumed obligation, admission or stipulated judgment to which it has not consented or for which the Insureds are not legally obligated. The Insureds shall not knowingly take any action which increases the Insurer's exposure for Loss under this Policy. The Insureds shall provide the Insurer with all information, assistance and cooperation which the Insurer reasonably requests and shall do nothing that may prejudice the Insurer's potential or actual rights of recovery with respect to Loss paid on account of a Claim.

If the Insurer recommends a settlement within the Policy's applicable Limits of Liability which is acceptable to the claimant and the Insureds refuse to consent, then the Insurer's liability for all Loss on account of such Claim shall not exceed the amount for which the Insurer could have settled such Claim, plus an additional fifty (50) percent of such amount, plus Defense Costs up to the date the Insureds refused to settle such Claim. However, in no event shall the Insurer's liability exceed the applicable Limits of Liability set forth in Item 3 (A), (B), or (C) in the Declarations.

## VI.  AWARENESS PROVISION

A.    If during the Policy Period any Insured becomes aware of circumstances which could give rise to a Claim, and the Insured gives written notice of such circumstances to the Insurer during the Policy Period, then any Claim subsequently arising from such circumstances shall be considered to have been made during the Policy Period in which the circumstances were first reported to the Insurer. No coverage shall be provided for fees and expenses incurred prior to the time such circumstances result in a Claim.

B.    The Insureds shall, as a condition precedent to exercising their rights hereunder:

1.    include with any notice of circumstances a description of such circumstances, the nature of the potential Wrongful Act, the nature and extent of the potential damages, the names of the potential claimants, the identities of the potential defendants and the manner in which the Insured first became aware of such circumstances; and

2.    give the Insurer such additional information and cooperation as it may reasonably require.

## VII.  NOTICES

All notices under any provision of this Policy must be made in writing and delivered by prepaid express courier, certified mail or fax. Notices to the Insureds shall be given to the Parent Company. Notices to the Insurer shall be given to the appropriate party at the address set forth in Item 10 in the Declarations. Notices given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notices are sent, whichever is earlier.

## VIII. GENERAL CONDITIONS

A.    Transactions That Impact Coverage under all Section 1. Insuring Agreements

1.    Acquisitions or Creations

a.    If, after the effective date of this Policy the Policyholder:

(i)    creates or acquires an entity;

(ii)    merges with another entity such that the Policyholder is the surviving entity; or

(iii)    assumes voting rights representing the present right to vote for election or to appoint more than fifty (50) percent of the directors or trustees of an entity (hereinafter (i)-(iii) of this subsection each a "Transaction");

then such entity and any subsidiaries shall be deemed to be a Subsidiary, only if the total number of employees in such entity and any subsidiaries prior to such Transaction does not exceed ten percent (10%) of the total number of Employees immediately prior to such Transaction.

b.   If, after the effective date of this Policy the Policyholder engages in a Transaction or acquires all or substantially all of the assets of another entity, and the total number of employees of the Policyholder after such acquisition exceeds a hundred and ten percent (110%) of the total number of Employees immediately prior to such acquisition, then this Policy shall provide insurance for such newly hired employees for a period of ninety (90) days after the effective date of such acquisition. At its sole option and upon submission of any and all information as it may require, the Insurer may, upon payment of any additional premium or modification of the provisions of this Policy that may be warranted, extend the insurance otherwise afforded through this subparagraph.

c.   Notwithstanding the provisions above, if the Policyholder engages in a Transaction or acquires all or substantially all of the assets of another entity and the total consideration paid exceeds ten (10) percent of the total consolidated assets of the Policyholder immediately prior to such Transaction or acquisition the Policyholder must give the Insurer full details of such Transaction or acquisition within 90 days of the effective date thereof, and the Insurer may require, in its sole discretion, additional terms, conditions and limitations of coverage and such additional premium in connection with the foregoing.

d.   There shall be no coverage for any Wrongful Act by such created, acquired or merged entity or by any persons or entities considered to be Insureds pursuant to paragraph (a) above, where such Wrongful Act occurred before the effective date of such creation, acquisition or merger.

2.   Acquisition of Parent Company

If, during the Policy Period, any of the following events occurs:

a.   the acquisition of the Parent Company, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the Parent Company into or with another entity such that the Parent Company is not the surviving entity; or

b.   the acquisition by any person, entity or group of persons or entities of the right to elect, appoint or designate at least fifty (50) percent of the directors of the Parent Company;

then coverage under this Policy shall continue until termination of the Policy Period and shall not be cancellable by the Parent Company, but only with respect to Wrongful Acts occurring prior to such merger, consolidation or acquisition. The Parent Company shall give written notice of such merger, consolidation or acquisition to the Insurer as soon as practicable together with such information as the Insurer may require. However, coverage under this Policy will cease as of the effective date of such event with respect to Wrongful Acts occurring after such event. The appointment by any state or federal official, agency or court of any receiver, trustee, examiner, conservator, liquidator, rehabilitator or similar official to take control of, supervise, manage or liquidate the Parent Company, or the Parent Company becoming a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law, shall not be considered an acquisition within the meaning of this Subsection.

3.   Cessation of a Subsidiary

If before or during the Policy Period an organization ceases to be a Subsidiary, coverage with respect to such Subsidiary and its Insureds shall continue until termination of the Policy Period, but only with respect to Wrongful Acts occurring prior to the date such organization ceased to be a Subsidiary.

B.   Representations and Severability With Respect To Application

In granting coverage to any one of the Insureds, the Insurer has relied upon the statements made in the written Application for this Policy and all information provided to the Insurer and upon the statements in the written application and information submitted to another insurer with respect to prior coverage incepting as of the

Continuity Date, if any, set forth in Item 9 in the Declarations. All such statements and information are the basis of this Policy and shall be incorporated in and constitute part of this Policy.

In order to determine if coverage is available:

1.   only facts pertaining to and knowledge possessed by any **Executive Officer** shall be imputed to the **Policyholder**; and

2.   no declaration or statement in the Application or knowledge possessed by the **Policyholder** or any **Insured Individual** shall be imputed to any other **Insured Individual**. Such written Application(s) for coverage shall be construed as a separate Application for coverage by each **Insured Individual**.

C.   Cancellation/Non-Renewal

1.   The **Parent Company** may cancel this Policy by giving the Insurer advance written notice of cancellation.

2.   The Insurer may only cancel this Policy in the event of nonpayment of premium by giving the **Parent Company** written notice of cancellation at least twenty (20) days before the effective time of cancellation.

3.   Notice of cancellation shall state the effective time of cancellation. The **Policy Period** shall end at that time.

4.   If this Policy is cancelled, the Insurer shall send the **Parent Company** any premium refund as soon as practicable. If the **Parent Company** cancels, the refund shall be on the customary short rate basis. The return or tender of a return premium is not a condition precedent to the cancellation becoming effective at the time stated in the cancellation notice.

5.   If the Insurer decides not to renew this Policy, the Insurer shall provide written notice to the **Parent Company** at least sixty (60) days prior to the end of the **Policy Period**.

6.   If any controlling law requires a longer period of notice by the Insurer, the Insurer shall give such longer notice.

D.   Other Insurance

If any **Loss** arising from any **Claim** is insured by any other policy(ies) of insurance, prior or current, then this Policy shall apply only in excess of and will not contribute with the amount of any deductibles, retentions and limits of liability under such other policy(ies), whether such policy(ies) is stated to be primary, contributory, excess, contingent or otherwise, unless such policy(ies) is written to be specifically excess of this Policy by reference in such other policy(ies) to this Policy's Policy Number indicated in the Declarations.

The coverage afforded under Insuring Agreement D shall be specifically excess of any indemnification and insurance available to such **Insured Individual** from the **Outside Entity**.

E.   Territory

This Policy shall apply to **Claims** made against the **Insureds** anywhere in the world.

F.   Valuation and Currency

All premiums, limits, Retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final or payment of the settlement or other element of **Loss** is due.

G.   Subrogation

In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all the **Insureds'** rights of recovery, and the **Insureds** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the **Insureds**.

H.   No Action Against Insurer

No action shall lie against the Insurer unless, as a condition precedent thereto, there has been full compliance with all the terms of this Policy. No person or organization shall have any right under this Policy to join the Insurer as a party to any action against the Insureds to determine the Insureds' liability, nor shall the Insurer be impleaded by the Insureds or their legal representatives.

I.   Bankruptcy

Bankruptcy or insolvency of the **Policyholder** or of any **Insured Individual** shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights or defenses under this Policy.

J.   Authorization

By acceptance of this Policy, the **Parent Company** agrees to act on behalf of the Insureds with respect to the giving and receiving of any notice provided for in this Policy (except the giving of notice to apply for any Extended Reporting or Runoff Period), the payment of premiums and the receipt of any return premiums that may become due under this Policy, and the agreement to and acceptance of endorsements, and the Insureds agree that the **Parent Company** shall act on their behalf.

K.   Alteration and Assignment of Interest

No change in, modification of, or assignment of interest under this Policy shall be effective except when made by a written endorsement to this Policy which is signed by an authorized representative of the Insurer. The Insureds agree that this Policy constitutes the entire agreement between the Insureds and the Insurer, or any of their agents or brokers. Notice to or knowledge possessed by the Insurer, the Insureds or any agent, broker or other person acting on behalf of the Insureds or Insurer shall not effect a waiver of or estop the Insurer or the Insureds from asserting any rights under this Policy.

L.   Headings

The descriptions in the headings and subheadings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

Endorsement No. <u>1</u>

Effective date of this endorsement:  12:01 a.m. on <u>November 13, 2011</u>
To be attached to and form part of Policy Number: <u>RON764017/01/2011</u>
Issued to: <u>Biochemics, Inc.</u>
By: <u>AXIS Reinsurance Company</u>

## POLICYHOLDER NOTICE – MASSACHUSETTS

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

### PRIVATUS
(INCLUDING DIRECTORS, OFFICERS AND CORPORATE LIABILITY, EMPLOYMENT PRACTICES LIABILITY, FIDUCIARY LIABILITY AND OUTSIDE EXECUTIVE LIABILITY INSURANCE)

### IMPORTANT NOTICE TO ALL MASSACHUSETTS POLICYHOLDERS:

In the event of a complaint, please contact us at:

*Axis U.S. Insurance*
*Legal Department*
*11680 Great Oaks Way*
*Suite 500*
*Alpharetta, Georgia 30022*
*Fax No.: 1 (678) 746-9317*

If you have been unable to contact or obtain satisfaction from the Insurer, you may contact the Massachusetts Division of Insurance to obtain information or make a complaint at:

*Commonwealth of Massachusetts*
*Division of Insurance*
*One South Station, 5th Floor*
*Boston, MA 02110-2208*

Endorsement No. 2

Effective date of this endorsement:  12:01 a.m. on November 13, 2011
To be attached to and form part of Policy Number: RON764017/01/2011
Issued to: Biochemics, Inc.
By: AXIS Reinsurance Company

## MASSACHUSETTS AMENDATORY ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## PRIVATUS
(INCLUDING DIRECTORS, OFFICERS AND CORPORATE LIABILITY, EMPLOYMENT PRACTICES LIABILITY, FIDUCIARY LIABILITY AND OUTSIDE EXECUTIVE LIABILITY INSURANCE)

1.   The first sentence of Section VII., NOTICES is deleted and replaced by the following:

Except with respect to notices from the Insurer as provided in Section VIII., GENERAL CONDITIONS, paragraph C., all notices under this policy must be made in writing and delivered by prepaid express carrier, certified mail, or fax properly addressed to the appropriate party.

2.   Section VIII., GENERAL CONDITIONS, paragraph C. Cancellation/Non-Renewal, subparagraph 1. is amended by the addition of the following:

Such notice of cancellation shall be delivered or mailed by first class mail, postage prepaid.

3.   Section VIII., GENERAL CONDITIONS, paragraph C. Cancellation/Non-Renewal, subparagraph 2. is amended by the addition of the following:

The notice of cancellation shall be delivered to the Parent Company, or be left at its last address as shown on the Insurer's records or, if its records contain no such address, at its last address known to the Insurer, or be mailed to the address of the Parent Company by first class mail, postage prepaid. No written notice of cancellation shall be deemed effective when mailed by the Insurer unless the Insurer obtains a certificate of mailing receipt from the U.S. Postal Service showing the name and address of the Parent Company as stated in the policy. The affidavit of any officer, agent or employee of the Insurer, duly authorized for that purpose, that such notice has been served shall be prima facie evidence that cancellation has been duly effected. If the policy is made payable to a mortgagee or any person other than the Parent Company, notice must also be given to the mortgagee or other person in the manner provided above.

All other provisions remain unchanged.

*Jan Thibault*

Authorized Representative

November 17, 2011
Date

PV 4108 (Ed. 0104)                                                      Printed in U.S.A.

Endorsement No. <u>3</u>

Effective date of this endorsement: 12:01 a.m. on <u>November 13, 2011</u>
To be attached to and form part of Policy Number: <u>RON764017/01/2011</u>
Issued to: <u>Biochemics, Inc.</u>
By: <u>AXIS Reinsurance Company</u>

## AMEND EXCLUSION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## PRIVATUS®

In consideration of the premium charged, it is agreed that Section IV. A. 5. is deleted in its entirety and amended to read as follows:

    "5.    based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

        a.  the gaining of any profit, remuneration, or advantage to which the Insured was not legally entitled; or

        b.  any criminal or deliberately fraudulent act, error or omission by an Insured;

        if evidenced by any judgment, final adjudication or alternate dispute resolution proceeding.

        With respect to exclusion A. 5. set forth above no fact pertaining to, knowledge possessed by or conduct by any Insured Individual shall be imputed to any other Insured Individual."

All other provisions remain unchanged.

*Jan Thibault*
Authorized Representative

November 17, 2011
Date

PV 1028 (Ed. 1106)                Page 1 of 1                Printed in USA

Endorsement No. 4

Effective date of this endorsement: 12:01 a.m. on November 13, 2011
To be attached to and form part of Policy Number: RON764017/01/2011
Issued to: Biochemics, Inc.
By: AXIS Reinsurance Company

## PRIORITY OF PAYMENTS ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## PRIVATUS®

In consideration of the premium charged, it is agreed that in the event of Loss arising from a Claim or Claims for which payment is due under the provisions of this Policy, and to the extent permitted by law, the Insurer shall:

1. first, pay such Loss from Claims against an Insured Individual for which coverage is provided under Section I. Insuring Agreement (A) of this Policy for which the Policyholder is not permitted by law to indemnify the Insured Individual or for which the Policyholder does not indemnify an Insured Individual by reason of Financial Impairment;

2. second, pay such Loss for which coverage is provided under Section I. Insuring Agreement (D);

3. third, pay such Loss from Claims against an Insured Individual for which the Policyholder is permitted to indemnify an Insured Individual and for which coverage is provided for such Claim under Section I. Insuring Agreement (A); and

4. then, with respect to whatever remaining amount of the Limits of Liability is available after payment of such Loss in accordance with paragraphs 1., 2. and 3. above, apply such remaining limits to remaining Loss in accordance with the order of when such Loss was incurred.

All other provisions remain unchanged.

_Jan Thibault_
Authorized Representative

November 17, 2011
Date

PV 1032 (Ed. 05/06)                    Page 1 of 1                    Printed in USA

Endorsement No. 5

Effective date of this endorsement:  12:01 a.m. on November 13, 2011
To be attached to and form part of Policy Number: RON764017/01/2011
Issued to: Biochemics, Inc.
By: AXIS Reinsurance Company

## AMEND ACQUISITION THRESHOLD ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## PRIVATUS®

In consideration of the premium charged, it is agreed that Section VIII. General Conditions, A. 1. of this Policy is deleted and replaced with the following:

1.   Acquisitions or Creations

    a.   If, after the effective date of this Policy the Policyholder:

       (i) creates or acquires an entity;

       (ii)   merges with another entity such that the Policyholder is the surviving entity; or

       (iii)   assumes voting rights representing the present right to vote for election or to appoint more than fifty (50) percent of the directors or trustees of an entity (hereinafter (i)-(iii) of this subsection each a "Transaction");

       then such entity and any subsidiaries shall be deemed to be a Subsidiary, only if the total number of employees in such entity and any subsidiaries prior to such Transaction does not exceed twenty five percent (25%) of the total number of Employees immediately prior to such Transaction.

    b.   If, after the effective date of this Policy the Policyholder engages in a Transaction or acquires all or substantially all of the assets of another entity, and the total number of employees of the Policyholder after such acquisition exceeds one hundred and twenty five percent (125%) of the total number of Employees immediately prior to such acquisition, then this Policy shall provide insurance for such newly hired employees for a period of ninety (90) days after the effective date of such acquisition.  At its sole option and upon submission of any and all information as it may require, the Insurer may, upon payment of any additional premium or modification of the provisions of this Policy that may be warranted, extend the insurance otherwise afforded through this subparagraph.

    c.   Notwithstanding the provisions above, if the Policyholder engages in a Transaction or acquires all or substantially all of the assets of another entity and the total consideration paid exceeds twenty five percent (25%) of the total consolidated assets of the Policyholder immediately prior to such Transaction or acquisition the Policyholder must give the Insurer full details of such Transaction or acquisition within 90 days of the effective date thereof, and the Insurer may require, in its sole discretion, additional terms, conditions and limitations of coverage and such additional premium in connection with the foregoing.

    d.   There shall be no coverage for any Wrongful Act by such created, acquired or merged entity or by any persons or entities considered to be Insureds pursuant to paragraph (a) above, where such Wrongful Act occurred before the effective date of such creation, acquisition or merger.

All other provisions remain unchanged.

*Jan Thibaut*
_____
Authorized Representative


November 17, 2011
_____
Date

Endorsement No. 6

Effective date of this endorsement: 12:01 a.m. on November 13, 2011
To be attached to and form part of Policy Number: RON764017/01/2011
Issued to: Biochemics, Inc.
By: AXIS Reinsurance Company

## AMEND EXCLUSIONS ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## PRIVATUS®

In consideration of the premium charged, it is agreed that:

1.    Section IV., Exclusions, D. 7. is deleted.

2.    Section IV., Exclusions, D. 5. is amended by adding the word "or" to the end thereof.

All other provisions remain unchanged.

_Jan Thibault_
Authorized Representative

November 17, 2011
Date

Endorsement No. 7

Effective date of this endorsement:  12:01 a.m. on November 13, 2011
To be attached to and form part of Policy Number: RON764017/01/2011
Issued to: Biochemics, Inc.
By: AXIS Reinsurance Company

## INSURED VS. INSURED EXCLUSION (AMENDED)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## PRIVATUS®

In consideration of the premium charged, it is hereby understood and agreed that Section IV. B. 1. e. of this Policy is hereby deleted and amended to read in its entirety as follows:

e.      brought or maintained by one or more Insured Individuals who have not served as directors, trustees, Managers, officers, or equivalent executives of the Policyholder within four (4) years immediately preceding the date the Claim is first made, and the Claim is brought and maintained totally independent of and without solicitation, assistance, active participation, or intervention of the Policyholder or any Insured Individual not described in this paragraph e; or

All other provisions remain unchanged.

*Jan Tribault*

Authorized Representative

November 17, 2011
Date

PV 1037 (Ed. 12/05)                  Page 1 of 1                  Printed in USA

Endorsement No. 8

Effective date of this endorsement: 12:01 a.m. on November 13, 2011
To be attached to and form part of Policy Number: RON764017/01/2011
Issued to: Biochemics, Inc.
By: AXIS Reinsurance Company

## NON-RESCISSION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## PRIVATUS®

In consideration of the premium charged, it is agreed that this Policy shall not be rescindable by the Insurer with respect to any Claim against an Insured Individual for which coverage is afforded under this Policy and for which:

1.      The Policyholder is not permitted by law to indemnify such Insured Individuals; or

2.      The Policyholder does not indemnify such Insured Individuals solely because of Financial Impairment.

Notwithstanding the foregoing, nothing herein shall affect the Insurer's rights under this Policy to adjust, investigate or deny claims or to otherwise reserve its rights under this Policy with respect to any Claim under any Insuring Agreement.


All other provisions remain unchanged.

*Jan Thibault*
_____
Authorized Representative


November 17, 2011
_____
Date

Endorsement No. 9

Effective date of this endorsement: 12:01 a.m. on November 13, 2011
To be attached to and form part of Policy Number: RON764017/01/2011
Issued to: Biochemics, Inc.
By: AXIS Reinsurance Company

## POLICY CORRECTION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## PRIVATUS®

In consideration of the premium charged, it is agreed that Section III., DEFINITIONS, A.7.a.(iii) of this Policy is deleted and amended to read in its entirety as follows:

(iii)     fines, penalties or sanctions imposed upon an Insured pursuant to the Internal Revenue Service's Voluntary Compliance Resolution Program, Closing Agreement Program, or Tax Sheltered Annuity Voluntary Correction program, subject always to the Sublimit of Liability set forth in Item 3(B) in the Declarations; or

All other provisions remain unchanged.

Jan Thibault
Authorized Representative

November 17, 2011
Date

Endorsement No. <u>10</u>

Effective date of this endorsement: 12:01 a.m. on <u>November 13, 2011</u>
To be attached to and form part of Policy Number: <u>RON764017/01/2011</u>
Issued to: <u>Biochemics, Inc.</u>
By: <u>AXIS Reinsurance Company</u>

## AMEND DEFENSE AND SETTLEMENT ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## PRIVATUS®

In consideration of the premium charged, it is agreed that Section V. D. Consent, Cooperation and Settlement, of this Policy is deleted and amended to read in its entirely as follows:

> "D.     Consent, Cooperation and Settlement
>
> The Insureds shall not settle any Claim, select any defense counsel, incur any **Defense Costs**, admit or assume any liability, stipulate to any judgment, or otherwise assume any obligation without the Insurer's prior written consent, which shall not be unreasonably withheld. The Insurer shall not be liable for any settlement, **Defense Costs**, assumed obligation, admission or stipulated judgment to which it has not consented or for which the Insureds are not legally obligated. The Insureds shall not knowingly take any action which increases the Insurer's exposure for Loss under this Policy. The Insureds shall provide the Insurer with all information, assistance and cooperation which the Insurer reasonably requests and shall do nothing that may prejudice the Insurer's potential or actual rights of recovery with respect to Loss paid on account of a Claim.
>
> If the Insurer recommends a settlement within the Policy's applicable Limits of Liability which is acceptable to the claimant (a "Proposed Settlement") and the Insureds refuse to consent, then the Insurer's liability for all Loss, Including **Defense Costs**, on account of such Claim shall not exceed:
>
> (a)     the amount of the Proposed Settlement plus **Defense Costs**, incurred up to the date of the Insured's refusal to consent to Proposed Settlement of such Claim; plus;
>
> (b)     eighty (80) percent of any Loss, including **Defense Costs**, in excess of the amount referenced in paragraph (a) above, incurred in connection with such Claim; subject in all events to the available Limit of Liability set forth in the Declarations.  The remaining twenty (20) percent of any Loss, including **Defense Costs**, in excess of the amount referenced in paragraph (a) above will be borne by the Insured uninsured and at its own risk.
>
> However, in no event shall the Insurer's liability exceed the applicable Limits of Liability set forth in Item 3 (A) or (B) in the Declarations."

All other provisions remain unchanged.

*Jan Thibault*

Authorized Representative

<u>November 17, 2011</u>
Date

Endorsement No. <u>11</u>

Effective date of this endorsement: 12:01 a.m. on <u>November 13, 2011</u>
To be attached to and form part of Policy Number: <u>RON764017/01/2011</u>
Issued to: <u>Biochemics, Inc.</u>
By: <u>AXIS Reinsurance Company</u>

## MANUSCRIPT APPLICATION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## PRIVATUS®

In consideration of the premium charged, it is agreed by the Insurer and Insureds that the application or proposal dated *October 15, 2011* and submitted to *Greenwich Insurance Company* on *Greenwich Insurance Company's* PC 95 01 01 01 form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above.  The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

All other provisions remain unchanged.

*Jan Thibault*
_____
Authorized Representative

<u>November 17, 2011</u>
Date



**Boston Regional Office**
**33 Arch Street, 23rd Floor**
**Boston, Massachusetts 02110-1424**
**Telephone: (617) 573-8900**
**Fax: (617) 573-4590**

**<u>FAX COVER SHEET</u>**

TO:                          Jason C. Moreau, Esq.
                             Greenberg Traurig

FAX NUMBER:                  (617) 279-8425

FROM:                        Joshua Grinspoon

DATE:                        January 5, 2012

Total number of pages (including cover sheet):      48

MESSAGE:

CONFIDENTIALITY NOTE:  THIS FACSIMILE TRANSMISSION IS INTENDED ONLY FOR THE PERSON TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL OR OTHERWISE PROTECTED FROM DISCLOSURE. DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FACSIMILE OR THE INFORMATION HEREIN BY ANYONE OTHER THAN THE INTENDED RECIPIENT IS PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE TRANSMISSION IN ERROR PLEASE RETURN IT TO THE U.S. SECURITIES AND EXCHANGE COMMISSION BY MAIL.

If you do not receive all the pages, please call immediately.



**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch St., 23rd Floor
Boston, MA 02110-1424
Telecopier: (617) 573-4590

DIVISION OF ENFORCEMENT

Joshua S. Grinspoon
Attorney
(617) 573-4502

January 5, 2012

**VIA FACSIMILE (617-279-8425) AND UPS**

Jason C. Moreau, Esq.
Greenberg Traurig
One International Place
Boston, MA 02110

    Re:   <u>In the Matter of BioChemics, Inc. (B-02641)</u>

Dear Jason,

    Pursuant to our telephone conversations and our email exchange on December 22, 2011 in which you did not object to accepting service of this subpoena on behalf of your clients Mr. Kevin Cassidy, Mr. Joseph Frattaroli, and Dr. Stephen Carter, I have enclosed subpoenas that require Messrs. Cassidy, Frattaroli, and Carter to give sworn testimony in the above-referenced matter.

    The subpoena for Mr. Cassidy requires him to come to the Boston Regional Office of the United States Securities and Exchange Commission, located at 33 Arch Street, 23rd Floor, Boston, MA 02110, on February 2, 2012 at 9:30 am to testify under oath. Mr. Cassidy must comply with the subpoena. He may be subject to a fine and/or imprisonment if he does not.

    The subpoena for Mr. Frattaroli requires him to come to the Boston Regional Office of the United States Securities and Exchange Commission, located at 33 Arch Street, 23rd Floor, Boston, MA 02110, on February 9, 2012 at 9:30 am to testify under oath. Mr. Frattaroli must comply with the subpoena. He may be subject to a fine and/or imprisonment if he does not.

    The subpoena for Dr. Carter requires him to come to the Boston Regional Office of the United States Securities and Exchange Commission, located at 33 Arch Street, 23rd Floor, Boston, MA 02110, on February 16, 2012 at 9:30 am to testify under oath. Dr. Carter must comply with the subpoena. He may be subject to a fine and/or imprisonment if he does not.

    Three copies of the SEC's background questionnaire are also enclosed. During the testimony, the staff intends to ask background questions concerning, among other things, residences, telephone numbers, education and employment. To expedite that part of the

Jason C. Moreau
January 5, 2012
Page 2

testimony, we request that Messrs. Cassidy, Frattaroli, and Carter complete the enclosed questionnaire on a voluntary basis and provide it to the staff prior to the testimony.

The enclosed SEC Form 1662 includes a List of Routine Uses of information provided to the Commission, and contains other important information.

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation and the subpoena do not mean that we have concluded that Messrs. Cassidy, Frattaroli, or Carter or anyone else has broken the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

If you have any other questions, you may call me at (617) 573-4502.

Sincerely,

Joshua S. Grinspoon
Attorney

Enclosures:   Mr. Kevin Cassidy Subpoena
              Mr. Joseph Frattaroli Subpoena
              Dr. Stephen Carter Subpoena
              SEC Form 1662 (Three Copies)
              Background Questionnaire (Three Copies)



# SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

**In the Matter of BioChemics, Inc. (B-02641)**

To:   Kevin M. Cassidy
      c/o Jason C. Moreau, Esq.
      Greenberg Traurig
      One International Place
      Boston, MA 02110

☐     **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the
      Securities and Exchange Commission, at the place, date and time specified below:

☒     **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place,
      date and time specified below:

      Securities and Exchange Commission, Boston Regional Office, 33 Arch Street, 23rd floor,
      Boston, Massachusetts 02110, on February 2, 2012 at 9:30 am.

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.**
Failure to comply may subject you to a fine and/or imprisonment.

By: _____           Date:  1/5/12

      Joshua S. Grinspoon, Attorney
      U.S. Securities and Exchange Commission
      33 Arch Street, 23rd Floor
      Boston, Massachusetts 02110

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this
matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation
under: Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS:      If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena

### A. False Statements and Documents

Section 1001 of Title 18 of the United States Code provides as follows:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact. or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title or imprisoned not more than five years, or both.

### B. Testimony

If your testimony is taken, you should be aware of the following:

1. *Record.* Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2. *Counsel.* You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied, represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3. *Transcript Availability.* Rule 6 of the Commission's Rules Relating to Investigations. 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled. upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however,* That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event. any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4. *Perjury.* Section 1621 of Title 18 of the United States Code provides as follows:

> Whoever . . . having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly . . . willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true . . . is guilty of perjury and shall, except as otherwise expressly provided by law. be fined under this title or imprisoned not more than five years or both . . . .

5. *Fifth Amendment and Voluntary Testimony.* Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6.   *Formal Order Availability.*  If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

C.  Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

> Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them. and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

> In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

D.  Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self addressed envelope.

E.  Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena.*  The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily.*  One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment

2

Case 1:13-cv-10691-RWZ   Document 1-1   Filed 03/27/13   Page 82 of 99

Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

## F. Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to Subpoena.* If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, if the subpoena was issued pursuant to the Securities Exchange Act of 1934, the Investment Company Act of 1940, and/or the Investment Advisers Act of 1940, and if you, without just cause, fail or refuse to attend and testify, or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena, you may be found guilty of a misdemeanor and fined not more than $1,000 or imprisoned for a term of not more than one year, or both.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

## G. Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

## H. Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1. To appropriate agencies, entities, and persons when (a) it is suspected or confirmed that the security or confidentiality of information in the system of records has been compromised; (b) the SEC has determined that, as a result of the suspected or confirmed compromise, there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the SEC or another agency or entity) that rely upon the compromised information; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

2. To other federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3. To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4. By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

5. In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6. In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7. To a bar association, state accountancy board, or other federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8. To a federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9. To a federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10. To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11. To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 – 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100-1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12. To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13. To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14. In reports published by the Commission pursuant to authority granted in the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15. To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16. To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 200.735-18, and who assists in the investigation by the Commission of possible violations of the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

17. To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18. To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

19. To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20. To respond to subpoenas in any litigation or other proceeding.

21. To a trustee in bankruptcy.

22. To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

* * * * *

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you have comments about the SEC's enforcement of the securities laws, please contact the Office of Chief Counsel in the SEC's Division of Enforcement at 202-551-4933 or the SEC's Small Business Ombudsman at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

## BACKGROUND QUESTIONNAIRE

**Please respond to the following questions in the space provided. If you need additional space for any response, you may attach additional pieces of paper.**

Today's date: _____

1. What is your full name?
   _____

2. Have you ever been known by any other name? Yes __ No __

   If yes, list each such name and the period(s) in which you were known by that name.

   _____
   _____
   _____

3. Social Security Number? _____

4. Date and Place of Birth?
   _____

5. Country of Citizenship?
   _____

6. Marital Status?  Married __ Divorced __ Single __

   If you have ever been married, state for each marriage: (i) the date(s) of the marriage; (ii) the name of your spouse; and (iii) your spouse's maiden name, if any.

   _____
   _____
   _____

7. List the names, ages and occupations of your children, if any.

   _____
   _____
   _____
   _____

Background Questionnaire
Page 2

8.    List all residences you occupied at any time during the last three years, including
      vacation homes, beginning with your current residence.  For each residence, state the
      address, dates of residence, and all telephone numbers (including facsimile numbers)
      listed at that address.

      _____

      _____

      _____

9.    List all telephone numbers and telephone credit card numbers that were in your name or
      that you regularly used at any time during the last three years.  Include all residential,
      business, car, credit card and cellular telephone numbers, including those listed in your
      response to question 8.  For each telephone number, state the name(s) of the
      corresponding long distance carrier(s) (e.g., Sprint, MCI, AT&T), if any.

      _____

      _____

## PUBLICLY-HELD COMPANIES

10.   Are you now, or have you ever been, an officer or director of any publicly-held
      company?  Yes __ No __

      If yes, identify each such company and state your positions and the dates you held each
      position.

      _____

      _____

11.   Are you now, or have you ever been, a beneficial owner, directly or indirectly, of five per
      cent or more of any class of equity securities of any publicly held company?
      Yes __ No __

      If yes, identify each such company, and state the amount, percentage, and dates of your
      ownership.

      _____

      _____

Case 1:13-cv-10691-RWZ   Document 1-1   Filed 03/27/13   Page 87 of 99

Background Questionnaire
Page 3

## SECURITIES ACCOUNTS

12.  List all securities or brokerage accounts that you have held in your name, individually or jointly, at any time during the last three years. Include all foreign accounts. For each such account, identify: (i) the brokerage firm; (ii) the location of the branch where your account is or was held; (iii) your broker; (iv) the type of account (i.e., cash, margin or IRA); and (v) whether any person has ever held discretionary authority or power of attorney over the account; if so, name such person(s).

_____
_____
_____
_____
_____

13.  List all securities or brokerage accounts (including foreign accounts), other than those listed in your answer to question 12, in which you had any direct or indirect beneficial interest at any time during the last three years. For each such account, provide the information requested by question 12.

_____
_____
_____
_____

14.  List all securities or brokerage accounts (including foreign accounts), other than those listed in your answer to question 12 or 13, over which you had any control at any time during the last three years. For each such account, provide the information requested by question 12.

_____
_____
_____
_____

Background Questionnaire
Page 4

## BANK ACCOUNTS

15.    List all accounts you have held in your name at any financial institution (i.e., bank, thrift, or credit union) at any time during the last three years. Include all foreign accounts. For each such account, identify: (i) the financial institution; (ii) the address of the branch at which your account is or was held; (iii) the type of account (i.e., checking, savings, money market or IRA); and (iv) whether any person has ever had discretionary authority or power of attorney over the account; if so, name such person(s).

    _____
    _____
    _____
    _____

16.    List all accounts at financial institutions (including foreign accounts), other than those listed in your answer to question 15, in which you had any direct or indirect beneficial interest at any time during the last three years. For each such account, provide the information requested by question 15.

    _____
    _____
    _____
    _____

17.    List all accounts at financial institutions (including foreign accounts), other than those listed in your answer to question 15 or 16, over which you had any control at any time during the last three years. For each such account, provide the information requested by question 15.

    _____
    _____
    _____
    _____

Background Questionnaire
Page 5

## PRIOR PROCEEDINGS

18. Have you ever testified in any proceeding conducted by the staff of the Securities and Exchange Commission, a federal or state agency, a federal or state court, a stock exchange, the National Association of Securities Dealers ("NASD") or any other self-regulatory organization ("SRO"), or in any arbitration proceeding related to securities transactions? Yes __ No __

If yes, for each such proceeding, identify: (i) the title of the proceeding; (ii) the organization or agency; and (iii) the date(s) on which you testified.

_____

_____

_____

_____

19. Have you ever been deposed in connection with any court proceeding? Yes __ No __

If yes, for each such proceeding, identify: (i) the title of the proceeding, and (ii) the date(s) on which you were deposed.

_____

_____

_____

_____

20. Have you ever been named as a defendant or respondent in any action or proceeding brought by the SEC, any other federal agency, a state securities agency, the NASD or any stock exchange? Yes __ No __

If yes, for each such proceeding, identify: (i) the title of the proceeding; (ii) the agency or tribunal; (iii) the substance of the allegations; (iv) the outcome of the proceeding; and (v) the date of the outcome.

_____

_____

_____

_____

Background Questionnaire
Page 6

21.    Have you ever been a defendant in any action (other than those listed in response to
       question 20) alleging violations of the federal securities laws? Yes __ No __

       If yes, for each such proceeding, identify: (i) the title of the proceeding; (ii) the court or
       tribunal; (iii) the outcome of the proceeding; and (iv) the date of the outcome.

       _____
       _____
       _____
       _____


22.    Have you ever been a defendant in any criminal proceeding other than one involving a
       minor traffic offense? Yes __ No __

       If yes, for each such proceeding, identify: (i) the title of the proceeding; (ii) the court or
       tribunal; (iii) the outcome of the proceeding; and (iv) the date of the outcome.

       _____
       _____
       _____
       _____


## EDUCATIONAL HISTORY

23.    Provide the requested information about each educational institution that you have
       attended beyond junior high school, beginning with the most recent and working
       backward to the date that you completed high school.

| Name of School | | | |
|---|---|---|---|
| City | State | Country | Zip Code |
| Dates of Attendance: Month/Year to Month/Year | | Degree/Major | Month/Year of Degree |

| Name of School | | | |
|---|---|---|---|
| City | State | Country | Zip Code |
| Dates of Attendance: Month/Year to Month/Year | | Degree/Major | Month/Year of Degree |

Background Questionnaire
Page 7

Name of School
_____

City                State              Country              Zip Code
_____

Dates of Attendance: Month/Year to Month/Year        Degree/Major        Month/Year of Degree
_____


Name of School
_____

City                State              Country              Zip Code
_____

Dates of Attendance: Month/Year to Month/Year        Degree/Major        Month/Year of Degree
_____

24.  Other than courses taken in connection with institutions listed in response to question 23, list any securities or business related courses taken since high school. For each such course, identify the date that the course was completed and the name of the institution or organization that offered the course.

_____
_____
_____
_____


## PROFESSIONAL LICENSES/CLUBS

25.  Do you hold, or have you ever held, any professional license? Yes___ No ___

If yes, for each such license, identify: (i) the license; (ii) the licensing organization; (iii) the date the license was awarded; (iv) the date such license terminated, if applicable; (v) the date(s) of any disciplinary proceeding(s) against you: and (vi) the outcome of any such disciplinary proceeding (e.g., reprimand, suspension, revocation).

_____
_____
_____
_____


26.  Are you, or have you ever been, a member of any professional or business club or organization? Yes ___ No ___

Case 1:13-cv-10691-RWZ  Document 1-1  Filed 03/27/13  Page 92 of 99

Background Questionnaire
Page 8

If yes, list for each: (i) the name of the club or organization; (ii) its address; and (iii) the date(s) of your membership.

_____

_____

_____

_____

## EMPLOYMENT HISTORY

27.  State your employment activities, beginning with the present and working backward to the date that you completed high school.

| Employer's Name/Self-Employment | | | Your Title |
|---|---|---|---|
| Employer's Street Address | | | Telephone Number |
| City | State | Country | Zip Code |
| Dates of Employment: Month/Year To Month/Year | | | |

| Employer's Name/Self-Employment | | | Your Title |
|---|---|---|---|
| Employer's Street Address | | | Telephone Number |
| City | State | Country | Zip Code |
| Dates of Employment: Month/Year To Month/Year | | | |

| Employer's Name/Self-Employment | | | Your Title |
|---|---|---|---|
| Employer's Street Address | | | Telephone Number |
| City | State | Country | Zip Code |
| Dates of Employment: Month/Year To Month/Year | | | |

| Employer's Name/Self-Employment | | | Your Title |
|---|---|---|---|

Background Questionnaire
Page 9

| | | | |
|---|---|---|---|
| Employer's Street Address | | | Telephone Number |
| City | State | Country | Zip Code |

Dates of Employment: Month/Year To Month/Year

| | | | |
|---|---|---|---|
| Employer's Name/Self-Employment | | | Your Title |
| Employer's Street Address | | | Telephone Number |
| City | State | Country | Zip Code |

Dates of Employment: Month/Year To Month/Year

| | | | |
|---|---|---|---|
| Employer's Name/Self-Employment | | | Your Title |
| Employer's Street Address | | | Telephone Number |
| City | State | Country | Zip Code |

Dates of Employment: Month/Year To Month/Year

| | | | |
|---|---|---|---|
| Employer's Name/Self-Employment | | | Your Title |
| Employer's Street Address | | | Telephone Number |
| City | State | Country | Zip Code |

Dates of Employment: Month/Year To Month/Year

CONTINUE ON ADDITIONAL SHEETS IF NECESSARY



# SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

**In the Matter of BioChemics, Inc. (B-02641)**

To:    Joseph Frattaroli
        c/o Jason C. Moreau, Esq.
        Greenberg Traurig
        One International Place
        Boston, MA 02110

☐    **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below:

☒    **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

    Securities and Exchange Commission, Boston Regional Office, 33 Arch Street, 23rd floor, Boston, Massachusetts 02110, on February 9, 2012 at 9:30 am.

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.**
    Failure to comply may subject you to a fine and/or imprisonment.

By:                                    Date:  1/5/12

    Joshua S. Grinspoon, Attorney
    U.S. Securities and Exchange Commission
    33 Arch Street, 23rd Floor
    Boston, Massachusetts 02110

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under: Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS:    If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## Supplemental Information for Persons Requested to Supply
## Information Voluntarily or Directed to Supply Information
## Pursuant to a Commission Subpoena

**A. False Statements and Documents**

Section 1001 of Title 18 of the United States Code provides as follows:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title or imprisoned not more than five years, or both.

**B. Testimony**

If your testimony is taken, you should be aware of the following:

1.  *Record.* Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2.  *Counsel.* You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied, represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3.  *Transcript Availability.* Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however,* That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4.  *Perjury.* Section 1621 of Title 18 of the United States Code provides as follows:

> Whoever . . . having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly . . . willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true . . . is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years or both . . . .

5.  *Fifth Amendment and Voluntary Testimony.* Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

SEC 1662 (09-11)

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6. *Formal Order Availability.* If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

C. Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

> Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

> In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

D. Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self addressed envelope.

E. Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena.* The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily.* One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment

Company Act of 1940: Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

## F. Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to Subpoena.* If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, if the subpoena was issued pursuant to the Securities Exchange Act of 1934, the Investment Company Act of 1940, and/or the Investment Advisers Act of 1940, and if you, without just cause, fail or refuse to attend and testify, or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena, you may be found guilty of a misdemeanor and fined not more than $1,000 or imprisoned for a term of not more than one year, or both.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

## G. Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

## H. Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1. To appropriate agencies, entities, and persons when (a) it is suspected or confirmed that the security or confidentiality of information in the system of records has been compromised; (b) the SEC has determined that, as a result of the suspected or confirmed compromise, there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the SEC or another agency or entity) that rely upon the compromised information; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

2. To other federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3. To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4. By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

5. In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6. In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

Case 1:13-cv-10691-RWZ   Document 1-1   Filed 03/27/13   Page 98 of 99

7. To a bar association, state accountancy board, or other federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8. To a federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9. To a federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10. To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11. To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 – 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100-1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12. To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13. To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14. In reports published by the Commission pursuant to authority granted in the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15. To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16. To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 200.735-18, and who assists in the investigation by the Commission of possible violations of the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

17. To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18. To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

19. To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20. To respond to subpoenas in any litigation or other proceeding.

4

21. To a trustee in bankruptcy.

22. To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

\* \* \* \* \*

*Small Business Owners:* The SEC always welcomes comments on how it can better assist small businesses. If you have comments about the SEC's enforcement of the securities laws, please contact the Office of Chief Counsel in the SEC's Division of Enforcement at 202-551-4933 or the SEC's Small Business Ombudsman at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.